793 So.2d 281 (2001)
Robert E. MOODY, Individually and as Tutor of the Minors, Leah Nicole Moody and Lacey Brooke Moody, Plaintiff-Appellee,
v.
BLANCHARD PLACE APARTMENTS, A Louisiana Partnership in Commendam, d/b/a Blanchard Place II, Calhoun Property Management, Inc. and Deep South Surplus, Inc., Defendants-Appellants.
No. 34,587-CA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 2001.
Rehearing Denied August 16, 2001.
*284 McGlinchey Stafford, P.L.L.C. by Dan E. West, Margaret Diamond, New Orleans, Counsel for Appellants, Blanchard Place Apartments, Calhoun Property Management, Inc. and Clarendon National Insurance Company.
Cook, Yancey, King & Galloway, by Herschel E. Richard, Jr., John T. Kalmbach, Shreveport, Counsel for Third Party Defendants/Appellees, Sears, Roebuck & Company, General Electric Company and Roper Corporation.
Jones, Odom, Davis & Politz, L.L.P., by John S. Odom, Jr., Shreveport, Counsel for Plaintiff/Appellee, Robert E. Moody.
Before NORRIS, WILLIAMS & PEATROSS, JJ.
PEATROSS, J.
This appeal arises from a personal injury suit filed by Robert E. Moody, individually and as tutor on behalf of his two minor daughters, Leah Nicole Moody and Lacy Brooke Moody, against Defendants, Blanchard Place Apartments; its manager, Calhoun Property Management, Inc.; and their insurance carrier, Clarendon National Insurance Company; for injuries *285 he sustained when he suffered an electric shock from a stove in an apartment he rented from Blanchard Place Apartments.[1] Defendants subsequently filed a third-party demand against Third Party Defendants, Sears, Roebuck & Co., General Electric Company and Roper Corporation, the manufacturers of the stove, for indemnification. Ultimately, Third Party Defendants were dismissed on summary judgment; and, after trial on the merits, judgment was cast against Defendants (Third Party Plaintiffs) in the sums of $363,611, $20,000 and $20,000, awarded respectively to Mr. Moody and his two daughters. All parties have appealed. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY
On May 30, 1996, Mr. Moody, who resided with his two daughters in apartment number 56 of Blanchard Place Apartments ("the Apartments"), sustained injuries when he received an electric shock from the stove on which he was cooking (hereinafter referred to as "the Stove"). The Stove was a ten-year old electric range manufactured by Roper Corporation ("Roper"), sold by Sears, Roebuck & Co. ("Sears") and provided for use to its tenants by the Apartments.
The incident occurred when Mr. Moody was cooking in a copper bottom pot on the back burner of the Stove and attempted to stir some noodles with a metal spoon. The strength of the current was so strong that it prevented Mr. Moody from immediately drawing away from the Stove. When Mr. Moody finally disengaged from the Stove (presumably when the circuit breaker was tripped), he stumbled backwards and hit his head, neck and back on the opposite kitchen wall. Mr. Moody's two daughters were present and witnessed the incident. One of Mr. Moody's daughters telephoned his mother and brother, who then summoned medical assistance.
Phyllis Richard, an employee of Calhoun Property Management, Inc. ("Calhoun") and the onsite manager of the Apartments, and Kenny Wells, the Apartments' maintenance man, arrived at Mr. Moody's apartment, unplugged the Stove and secured the circuit breaker by turning off all of the circuits and taping the cover shut. Ms. Richard photographed the Stove that evening and placed the developed photographs in the maintenance file of apartment number 56. The photographs, however, were not available at trial because they were missing from the file at the time of trial.
Mr. Wells examined the Stove the day after the incident and discovered a small hole burned in the frame of the Stove at a point where a wire had been pinched between the Stove deck lid, or cooktop, and the burner box bottom.[2] That wire, which was near the oven thermostat, was burned in two and the nearby insulation was also burned.
Mr. Wells took a wire from another stove that was in the warehouse and repaired the Stove, which was then placed in apartment number 35. The Stove was used without incident until April 1997, when all appliances at the Apartments were replaced. According to Defendants, a large "X" was placed on the front of the *286 Stove with black electrical tape to distinguish it from the others that were to be stored on the Apartments' premises. The Stove was later mistakenly moved to a central warehouse located in Mansfield where it was cannibalized for parts in accordance with Calhoun's policy of stripping old appliances for usable parts.
When it was discovered that the Stove had been cannibalized, the remainder of the Stove was returned to the storage facility at the Apartments. The missing parts were replaced, but not necessarily with the same parts that had been previously removed.
On May 15, 1997, Mr. Moody filed suit against Defendants alleging that they were strictly liable for the defective Stove in their custody. The Stove was examined in September of 1997 by Defendants' expert, Alan Weckerling.[3] It was Mr. Weckerling's opinion that the metal grounding strap at the back of the Stove, the bottom portion of which should have been screwed into the metal chassis of the Stove, had never been so attached.[4] Photographs taken by Mr. Weckerling purportedly showed that neither the grounding strap nor the screw holes in the metal plate onto which the strap was to be screwed had ever been used. Mr. Weckerling also found electrical tape on the wiring of the Stove near its thermostat.
Following Mr. Weckerling's inspection, Defendants filed a Third Party Demand seeking indemnity against Third-Party Defendants. Plaintiffs did not directly sue Third-Party Defendants.
In April 1998, the Stove was again examined by Mr. Weckerling and by Richard Schults, a retired electrical engineer from Roper who was hired as their expert by Third Party Defendants. Both men discovered that the bottom portion of the grounding strap had been attached to the grounding plate and other changes to the Stove were also apparent. The electrical tape near the thermostat was still present.
Numerous motions were filed by Third Party Defendants and Defendants (Third Party Plaintiffs). On February 23, 2000, Third Party Defendants filed a motion for summary judgment. In their motion, they alleged that Defendants (Third Party Plaintiffs) could not carry their burden of proof, primarily due to spoliation of evidence. On February 25, 2000, Third Party Defendants filed a motion in limine seeking to exclude any evidence regarding the manufacture of the Stove due to such spoliation of the evidence. The crux of Third Party Defendants' argument was that, given the length of time since the Stove was manufactured and sold and the fact that it had been cannibalized for unknown parts, there was simply no way to prove that the Stove was in any way defective when it was sold to Calhoun in 1985 for placement at the Apartments.
On March 6, 2000, Mr. Moody and Defendants filed motions in limine regarding specific witnesses not related to the condition of the Stove. These motions were referred to the merits. On that same date, Third Party Defendants filed motions in limine regarding the testimony of Allen *287 Weckerling, the expert on behalf of Defendants (Third Party Plaintiffs), challenging his qualifications as an expert, and the testimony of Dr. Cedric Walker, another expert listed by Defendants (Third Party Plaintiffs). Each of these motions was also referred to the merits. On March 7, 2000, Third Party Defendants filed a peremptory exception of no cause of action in reference to the demand filed by Defendants (Third Party Plaintiffs). Third Party Defendants asserted that, under Louisiana's system of pure comparative fault, Defendants (Third Party Plaintiffs) were not entitled to indemnity as they asserted. Further, Mr. Moody had never joined Third Party Defendants in his suit. This exception was also referred to the merits.
Ultimately, Third Party Defendants were dismissed on their motion for summary judgment. Consequently, the remaining motions were found moot and not ruled on by the trial court.
The remaining claims proceeded to trial; however, pursuant to the dismissal of Third Party Defendants, the trial court disallowed the introduction of any evidence pertaining to the manufacture of the Stove. This evidence was proffered by Defendants (Third-Party Plaintiffs). See footnote number three, supra.
Mr. Schults, whose testimony was not disallowed, testified at trial that the grounding strap should have been attached by the manufacturer during the assembly of the Stove at the factory. He could not say that this had not been done, particularly in light of the fact that each stove is given a 1,250 volt surge before it leaves the factory. Such a surge would have disclosed the presence of any electrical defect which would have been repaired before the Stove was shipped from the factory. Mr. Schults also testified that the manufacturer would never have used electrical tape on the wire or thermostat because the area in which the thermostat was mounted was subject to extreme temperatures that could melt electrical tape. Mr. Schults further testified that using electrical tape in such an application would be defective maintenance.
According to the maintenance records for the Moody apartment number 56, a thermostat was replaced in the apartment on April 2, 1990. Ms. Richard's unrebutted testimony was that this involved a thermostat for the Stove; had it been for the replacement of an air conditioning thermostat, there would have been an additional work order approving the purchase and assigning an order number due to the expense. Since used stove thermostats were taken from defunct appliances in the storage area when one was needed, there would only be one work order. Ms. Richard further testified that she had frequently seen electrical tape used on stove repairs.
As stated above, at trial, any evidence pertaining to manufacturer fault was excluded. The jury, therefore, received no information regarding manufacturer fault and, as previously stated, found in favor of Plaintiffs and against Defendants.
Following the lodging of this case on appeal, on January 4, 2000, with leave of this court, Defendants (Third-Party Plaintiffs) filed a supplemental appeal brief in which they asserted a claim in redhibition against Third-Party Defendants for the first time. On April 3, 2001, one day prior to oral arguments, Third-Party Defendants filed a peremptory exception of no cause of action and, in the alternative, an exception of prescription, in response to the redhibition claim urged by Defendants (Third-Party Plaintiffs).

DISCUSSION

Summary Judgment
Defendants argue in brief that the trial court erred in granting summary judgment *288 against them as a sanction for spoliation of evidence in their care. Although we are not provided with reasons for judgment, it is clear that summary judgment was granted due to the inability of Defendants (Third-Party Plaintiffs) to carry their burden of proving that the Stove was defective when it left the control of Third-Party Defendants.[5]
The supreme court in Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991), directs that an appellate court conduct a de novo review of the documents supporting and opposing a motion for summary judgment under the same criteria which govern the district court's consideration of whether summary judgment is appropriate pursuant to La. C.C.P. art. 966. Dumas v. Angus Chemical Company, 31,399 (La. App.2d Cir.1/13/99), 729 So.2d 624; Adams v. Falcon Equipment Corporation, 30,754 (La.App.2d Cir.8/21/98), 717 So.2d 282, writs denied, 98-2472 (La.11/18/98), 729 So.2d 1 and 98-2451 (La.11/20/98), 729 So.2d 561; Traweek v. Jackson, 30,248 (La.App.2d Cir.2/25/98), 709 So.2d 867; Berzas v. OXY USA, Inc., 29,835 (La. App.2d Cir.9/24/97), 699 So.2d 1149. Thus, an appellate court questions whether a genuine issue of material fact exists and whether the mover is entitled to judgment as a matter of law. Dumas v. Angus Chemical Company, supra; Potter v. First Federal Savings and Loan Association of Scotlandville, 615 So.2d 318 (La.1993); Gleason v. State Farm Mutual Auto. Insurance Company, 27,297 (La.App.2d Cir.8/23/95), 660 So.2d 137, writ denied, 95-2358 (La.12/15/95), 664 So.2d 454.
Effective May 1, 1996, La. C.C.P. art. 966 was amended to legislatively overrule the jurisprudential presumption against summary judgment. See Acts 1996, 1st Ex.Sess., No. 9. The amendment "leveled the playing field" between the parties by allowing the supporting documents submitted by the parties to be scrutinized equally and removing the overriding presumption in favor of trial on the merits. Dumas v. Angus Chemical, supra; Hayes v. Autin, 96-287 (La.App. 3d Cir.12/26/96), 685 So.2d 691, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41; Berzas v. OXY USA, Inc., supra. A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966; Dumas v. Angus Chemical Company, supra; Adams v. Falcon Equipment Corp., supra; Mixon v. Progressive Specialty Co., 29,698 (La. App.2d Cir.6/18/97), 697 So.2d 662.
Again in 1997, the legislature amended La. C.C.P. art. 966 by Acts 1997, No. 483, to state that, if the moving party points out that there is an absence of factual support for one or more of the essential elements to the adverse party's claim, action or defense, and the nonmoving party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact and summary judgment should be granted. See also Dumas v. Angus Chemical Company, supra; Adams v. Falcon Equipment Corp, supra; Berzas v. OXY USA, Inc., supra. When a motion for summary judgment is made and supported, an adverse party may not rest on his pleadings, but his responses, by affidavits or other competent *289 evidence, must set forth specific facts showing a genuine issue of material fact for trial. La. C.C.P. art. 967; Dumas v. Angus Chemical Company, supra; Adams v. Falcon Equipment Corp., supra.
In determining whether the trial court correctly found that Third-Party Defendants carried their burden as movers in summary judgment and that Defendants failed to do so as non-movers, we look to the elements which must have been proven for Defendants to prevail in their claim. La. R.S. 9:2800.54 encompasses the law of products liability regarding manufactured products and states, in pertinent part:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in La. R.S. 9:2800.55;
* * *
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer....
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
(Emphasis ours).
La. R.S. 9:2800.55 states:
A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer. (Emphasis ours).
Third-Party Defendants argue that Defendants are incapable of showing that the Stove was defective at the time it left the manufacturer. In light of the fact that the Stove was purchased by Defendants at least 10 years prior to the incident and the Stove had been altered in an unknown fashion subsequent to the incident, if not also before, we agree.
In Norris v. Bell Helicopter Textron, 495 So.2d 976 (La.App. 3d Cir.1986), writ denied, 499 So.2d 85 (La.1987) the court opined that alterations and repairs, subsequent to the purchase of a product, alone are not an absolute bar to a finding of liability on the part of the manufacturer. Rather, the lapse of time, inadequate "accounting" for use between manufacture and accident and alterations and repairs by persons other than the manufacturer will tend to negate the inference of a defect existing at the time of manufacture.
The burden of Defendants (Third-Party Plaintiffs) to prove causation is by a preponderance of the evidence, which may be met either by direct or circumstantial evidence. Norris v. Bell Helicopter Textron, supra; Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (La.1971). Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. In the case sub judice, we are faced primarily with circumstantial evidence. There is direct evidence showing only when and to whom the Stove in question was sold. We are left, however, with circumstantial evidence which fails to show that the Stove was burdened with a defect *290 when it left control of Third-Party Defendants.
Third-Party Defendants included the deposition of Blackie Fitch, the general manager of Calhoun; the affidavit of Richard Schults, their engineering expert; and the affidavit of Wayne Keys, the Sears salesman who sold 32 stoves to Calhoun; in support of their motion for summary judgment. Defendants included the deposition of Blackie Fitch; the deposition of Richard Schults; the deposition of Alan Weckerling, their electrical expert; and the deposition of Phyllis Richard.
In his deposition, Mr. Fitch admitted that there was no written record of what occurred to the Stove after the incident involving Mr. Moody. He stated that he came across the Stove in the storage area at the Apartments while doing a routine round of inspections some time after the incident. He further admitted that he did not know why the Stove was there and had to ask Ms. Richard the reason that it was there. It was at that time that he learned it was the Stove from Mr. Moody's apartment. He further stated that, under standard operating procedure, the Stove was to have been tagged with the apartment number, date of removal from service and the nature of the problem with it; but this was not done. Instead, a black "X" was placed on the Stove with electrical tape. Furthermore, he was unaware that the Stove had actually been placed back in service after the incident involving Mr. Moody.
Mr. Fitch also stated that it was his understanding that the Stove was robbed of some parts before it was mistakenly moved to the central warehouse in Mansfield. In explaining why the Stove was moved, he related that it was Calhoun's policy to send a truck to each of its properties approximately every three months to pick up any appliances that were out of use and take them to the Mansfield warehouse where they could be cannibalized for parts. Apparently, the Stove was removed to Mansfield in that manner.
Mr. Fitch stated that he did not know which parts had been taken from the Stove when it was cannibalized and could not say that the Stove was in the same condition it had been in at the time of the incident. The only person who would be in a position to know what parts were removed and replaced on the Stove was Tom Gardner, the maintenance supervisor, and neither his deposition nor his affidavit was ever taken or obtained.
In his affidavit, Mr. Schults stated that he examined the Stove on April 14, 1998, and found that the grounding strap had been attached. This was in contradiction to the photographs of the Stove that were taken by Mr. Weckerling in September 1997, which purportedly depicted the Stove without the grounding strap attached.
Mr. Schults also stated that the warning labels and instructions for installation which accompanied the Stove were adequate and specifically called for a qualified electrician to install the Stove. He opined that no further warning or explanation was necessary.
Mr. Key's affidavit stated that he was a salesman for the Shreveport Sears store in 1985 and that he sold 32 stoves and three-prong power cords to the Apartments. According to him, the power cords are sold separately from the stoves which are delivered without the power cord attached which is something that must be done during installation.
This fact is significant because in attaching the power cord to the stove, one of its three prongs must be attached to the neutral or grounding post to which the grounding strap is also attached. The grounding strap must be removed from *291 that post for the cord to be properly attached. We can, therefore, conclude that the grounding strap was removed from the grounding post on at least one occasion when the Stove was initially installed. The testimony of Mr. Schults indicates that the grounding strap was removed at least two more times, once when the power cord was removed prior to storage of the Stove and once again when the power cord was reattached for inspection of the Stove.
With this evidence, we find that Third-Party Defendants have carried their initial burden showing that there was a significant "lapse of time, inadequate `accounting' for use between manufacture and accident and alterations and repairs by persons other than the manufacturer," which tend to negate any inference of defect existing at the time of manufacture. Norris v. Bell Helicopter Textron, supra. There is no record of the condition of the Stove when it left the manufacturer or after the incident, a crucial element of Defendants' claim.
At this point, the burden shifts to Defendants (Third-Party Plaintiffs) to show that there was a defect and that it did exist when the Stove left the control of Third-Party Defendants. We find that they have failed to carry this burden.
Defendants assert that the statement made by Mr. Fitch in his deposition that parts of the Stove had been removed and he could not say what parts had been removed was a general statement. They argue that since it was a general statement, it is inconclusive as to whether or not the grounding strap was one of the parts cannibalized. Defendants also submit that, regardless of whether the strap itself was taken and then replaced, the photographs taken by Mr. Weckerling in April 1997 and his accompanying opinion are conclusive that, prior to the examination by Mr. Schults in April 1998, the grounding strap was never attached to the grounding plate.
In his examination of the Stove in 1997, Mr. Weckerling stated that he found that the grounding strap was not attached to the plate. He further found that the prepunched attachment holes in both the strap and the plate were in "pristine" condition, i.e., there were no screwhead marks or threading marks in or around the prepunched holes on either object which would indicate that a screw had ever been therein inserted.
Mr. Weckerling further opined that the original grounding strap may have been removed from its attachment to the above mentioned grounding post of the Stove during the period of cannibalization, but the bolt did not show any torque marks which would probably have been apparent if it had been removed. Further, in his opinion, regardless of whether it was removed, that does not affect the fact that the other end of the grounding strap was never attached to the grounding plate.
Mr. Weckerling accompanied Mr. Schults when he examined the Stove in September 1998. Mr. Weckerling stated that he found that there were many changes from the first time he had viewed the Stove. The black box which normally covers the area where the grounding strap is located and the power cord is attached (the terminal box) was missing. The grounding strap had either been shortened or was entirely replaced by a new, shorter grounding strap.
In his deposition, Mr. Schults also stated that the Stove was in a different condition than what it appeared in Mr. Weckerling's photographs which he had reviewed. Specifically, he noted the terminal block was different because it was held on with different bolts.
*292 Finally, Phyllis Richard testified in her deposition that the Stove was fixed by Kenny Wells after the incident and placed in another apartment where it remained in service until the complex was renovated and all of the stoves were replaced. Ms. Richard stated that, when the Stove was removed from service, it was marked with a large "X" on the side with a black pen. In reality, as the photographs show, a large "X" was placed on the top of the Stove with electrical tape. The Stove was removed to Mansfield after she left the employ of Calhoun so she was unaware of what happened to it.
The unrecorded condition of the Stove at the time it was purchased and after the accident, the fact that there is no record of the repair history of the Stove, the fact that it was later used in another apartment where any modifications could have occurred unknown to Defendants and the fact that it was cannibalized for unknown parts which were later replaced cannot be overcome by Defendants' argument regarding the condition of the grounding strap and plate holes. Under the circumstances, there is no way to know whether these parts were taken and replaced. As stated above, the person that could possibly clear up some of the confusion, Tom Gardner, Calhoun's Maintenance Manager, was never deposed, nor did he give an affidavit.
Following a de novo review of the record on summary judgment, we find that Defendants failed to carry their burden. Third-Party Defendants alleged that there is an absence of factual support regarding the condition of the Stove when it left the manufacturer and was sold in 1985. We agree. There is no material issue of fact regarding the presence of a defect in the Stove at that time. Summary judgment was properly granted. This assignment of error has no merit.
Third-Party Defendants also asserted assignments of error regarding the exceptions of no cause of action and prescription and the motions in limine which they filed. Discussion of these assignments is pretermitted by the above finding.

Strict Liability
We now turn to the condition of the Stove while it was under the control of Defendants. Both negligence and strict liability theories require proof that the defendant had custody of the thing causing the injury, that it contained a defect, that is, a condition creating an unreasonable risk of harm, and that the defective condition caused plaintiffs injury. La. C.C. arts. 2317 and 2317.1; Davis v. Diamond Shamrock Refining and Marketing Co., 34,309 (La.App.2d Cir.12/6/00), 774 So.2d 1076. Since this accident occurred subsequent to the enactment of La. C.C. art. 2317.1, Plaintiffs are further required to prove that Defendants knew or should have known of the vice or defect. La. C.C. art. 2317.1 states:
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
Defendants assert that the jury erroneously found them liable under La. C.C. arts. 2317 and 2317.1 because the jury was not presented with all of the facts. Specifically, Defendants assert that Plaintiffs could not have proven to the jury that the Stove was unreasonably dangerous because the condition which rendered it so *293 was its lack of grounding, a fact which the Defendants did not know and which was not revealed to the jury. On this record, we find no merit to this argument.

Unreasonable Risk of Harm
There is no issue regarding the ownership of the Stove as vested in Defendants. We, therefore, first address whether the Stove presented an unreasonable risk of harm. A determination of whether a thing presents an unreasonable risk of harm should be made "in light of all relevant moral, economic, and social considerations." Celestine v. Union Oil Co. of California, 94-1868 (La.4/10/95), 652 So.2d 1299, quoting Entrevia v. Hood, 427 So.2d 1146 (La.1983). In applying the risk-utility balancing test, the factfinder must weigh factors such as gravity and risk of harm, individual and societal rights and obligations and the social utility involved. Boyle v. Board of Supervisors, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080.
In Kendall v. Weingarten Realty Management Co., 33,903 (La.App.2d Cir.9/27/00), 769 So.2d 171, citing Johnson v. Brookshire Grocery Company, Inc., 32,770 (La.App.2d Cir.3/1/00), 754 So.2d 346, writ denied, 00-0938 (La.5/26/00), 762 So.2d 1107, this court stated:
The determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case. The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Consequently, the findings of the jury or trial court should be afforded deference and thus, the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. A reviewing court may only disturb the lower court's holding upon a finding that the trier of fact was clearly wrong or manifestly erroneous. (Citations omitted).
See also Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362.
Ms. Richard testified that, when she first became manager at the Apartments in February or March 1995, Calhoun's maintenance policy required that each apartment manager procure outside maintenance help from whomever was willing to do the job based on a given price list. The price list gave the maximum amount that could be paid for any given job which needed to be performed at the complex. To her recollection, some of the prices included $2.50 to change a mini-blind; $5.00 to change an air conditioning or stove thermostat; $35.00 to paint a one-bedroom apartment and $10.00 to change a kitchen water faucet. She further testified that maintenance work was often performed by her 17 year old son, tenants or herself. Given these facts, it appears to this court that Calhoun's concern was the cost, not the quality of the work performed.
Ms. Richard was eventually authorized to hire an on-site maintenance man to live on the property. In approximately June or July 1995, she hired Kenny Wells. Mr. Wells was provided with an apartment as part of his compensation. The record does not reflect the qualifications which were required of Mr. Wells or the salary which he was paid.
Mr. Wells testified that he inspected and repaired the Stove on the day following the incident. During his inspection, he found that there was a burned wire underneath the cooktop which appeared to have been pinched between the cooktop and the burner box bottom. Near the thermostat, he also found that a hole had been burned in the burner box bottom where the wire had been. The hole had also burned through the insulation which keeps the *294 oven heat from rising up and affecting the control mechanisms. In Mr. Wells' opinion, the wire had somehow arced to the frame causing the hole to be burned. He replaced the burnt wire with one from another stove that was out of service and then placed the Stove back into service in another apartment.
Mr. Schults testified at trial regarding his 1998 inspection of the Stove. He noted the hole that was burned in the burner box bottom and he agreed with Mr. Wells that there had been an electric short. He further agreed that it could have been caused by a wire being pinched between the cooktop and burner box bottom.
Mr. Schults also opined that, had anyone been touching the electrically charged Stove top when the short occurred, that person would have received a shock. Further, the amperage of the shock would have exceeded what is known as "let-gocurrent." This is the amperage at which the muscles of the human body are caused to contract and the person is unable to let go of the element that is shocking him or her, unless, or until, the circuit is broken, hence the purpose of the circuit breaker. In fact, Mr. Schults opined that the amperage was sufficient to be lethal.
Further, Mr. Schults noted during his inspection that the installation manual which accompanied the Stove stated that the Stove should be powered by a circuit of no higher than 40 amps. The circuit which powered the Stove in Plaintiffs' former apartment was 50 amps. When questioned as to whether or not Mr. Schults knew for certain that this was the case on May 30, 1996, some two years before, he replied that he did not know of his own personal knowledge, but his inspection of the wiring of the circuit box showed the same amount of oxidation on all of the wires, including the one used to power the Stove outlet. In his opinion, this indicated that none of the wires had been changed. There is no evidence that the circuit box in its entirety has ever been changed.
Mr. Schults explained that the effect of having a higher than recommended amperage is twofold. First, it diminishes the life of the wiring due to the extra amperage which it carries. Second, when a wire does short, the added amperage means that there is 25 percent more amperage flowing and that it takes, exponentially, about twice as long for the circuit breaker to be tripped. He further explained that it is the amperage, not the voltage, that is lethal in electricity.
Mr. Schults also noted in his inspection of the Stove that electrical tape had been used on the wires attached on either side of the Stove's thermostat. In Mr. Schults' opinion, this was defective maintenance because of the temperatures which might be reached in that area of the Stove. He explained that the location of the thermostat above the oven can reach heats of over 200°, despite the insulation between the oven and the cooktop. Electrical tape is rated to only withstand 150°degrees, whereas the wires attached in that area should be rated to withstand 280°, as do the wires initially installed. He further explained that electrical tape will "ooze" and "melt" at such temperatures, which can cause a short if there is any tension in the wire. Furthermore, when the cooktop is closed, the thermostat and adjacent wires covered in electric tape come down precisely where the burn in the burner box bottom was located.
In light of this evidence, we cannot say that the jury was manifestly erroneous or clearly wrong in finding that the condition of the Stove was unreasonably dangerous. Calhoun's policy of not requiring, and practically making it cost prohibitive to have, qualified technicians maintain the *295 electrical appliances on their premises carries too high of a risk of harm in light of the social utility involved. There is no individual right to endanger others for the sole purpose of cutting costs which can be weighed against societal rights and obligations.

Knowledge of the Unreasonably Dangerous Condition
As stated above, Plaintiffs must show that Defendants knew or should have known of the unreasonably dangerous condition in order to be found liable under La. C.C. art. 2317.1. We find that Plaintiffs have carried that burden.
Ms. Richard's testimony regarding the maintenance policies of Calhoun revealed that, because the Apartments were federally financed, she was required to inspect each apartment every month for fire hazards. This included inspection of the stoves, but did not include inspection of the actual wiring beneath the cooktop where the short occurred. She did state, however, that she was aware that electrical tape was frequently used in the repairs of electrical appliances. She stated that such a practice was "common" and "they did that a lot." She explained that electrical tape was frequently used as a substitute means of repairing wires by maintenance workers who did not know how to solder.
Given this testimony, coupled with Calhoun's discount maintenance policy and Mr. Schults' testimony, we find that the jury had ample evidence that Defendants knew or should have known of the defective nature of the Stove. As stated above, Calhoun's policy of not requiring that (and almost making it cost prohibitive to have) qualified technicians maintain the electrical appliances on their premises is indicative that it knew or should have known that a dangerous condition was or could have been present in any of its appliances, including the Stove.
In conclusion, we find that Plaintiffs have carried their burden pursuant to La. C.C. art. 2317.1. We cannot say that the jury was manifestly erroneous in finding that the Stove presented an unreasonable risk of harm and that Defendants knew or should have known that the Stove presented such an unreasonable risk.

Causal Relationship
The final element which Plaintiffs must prove is that the injuries received by Plaintiffs were caused by the defect in the Stove. We find that this element has also been proven as discussed in more detail below.

Damages
Defendants assert that there is insufficient evidence to support the jury's award of $362,611 to Mr. Moody, arguing that he has failed to prove that the majority of his damages were caused by the electric shock which he received. Specifically, they submit that the injury to Mr. Moody's cervical spine is not supported by the evidence as having been caused by the incident.
It was the testimony of Mr. Moody and his daughters that, after being shocked by the stove, Mr. Moody was thrown back against the opposite kitchen wall, hitting his head and neck which resulted in a herniation of his C5-6 vertebra. Defendants argue that, because Mr. Moody did not complain of left-sided neck or related pain until some six months after the incident, he has failed to prove that any such injury is related to the incident. They further assert that any such injury was caused by Mr. Moody's return to his strenuous job activity.
Dr. Kirit S. Patel, an internist trained in pulmonary and critical care, was the on-call physician in the emergency room when Mr. Moody arrived at the hospital. Dr. *296 Patel saw Mr. Moody on May 30, 1996, and admitted him to the hospital. His exam revealed that Mr. Moody had sustained an acute electrical shock and injury to his nervous system. Specifically, Mr. Moody was suffering from motor weakness, sensory deficit and ataxia, or failure of muscular coordination, in his lower limbs. He was actually unable to stand. Mr. Moody also complained of weakness and aching in all four limbs. Dr. Patel stated that these are normal complaints and symptoms of electric shock. Upon discharge, Mr. Moody was still suffering from peripheral sensory and motor neuropathy of his extremities.
Dr. Patel testified that he was not aware at the time of Mr. Moody's admission that Mr. Moody had fallen. Since he was unconscious for some time after the incident, Mr. Moody, unfortunately, could not be clear about how his injuries had occurred.
At his first post-discharge visit on July 2, 1996, Mr. Moody still had numbness, tingling and weakness in both legs and pain in both elbows and was suffering from dizziness. Dr. Patel diagnosed him with post-electrical shock induced paraesthesia (abnormal sensation). Dr. Patel also noted tenderness in the temporal area of Mr. Moody's neck.
At his next visit on August 1, 1996, Mr. Moody complained of generalized body aches, popping joints, weakness, headaches, progressive weakness of lower limbs, blurred vision and aching in his right hand. EMG and nerve conduction studies showed continued bilateral lower limb peripheral neuropathy.
Mr. Moody's condition was relatively unchanged on his August 19, 1996 visit with Dr. Patel. He had begun, however, experiencing a problem with holding objects in his right hand. Dr. Patel opined that this could be caused by a compression of nerves in the neck or carpal tunnel syndrome which seemed to be indicated by the nerve conduction study performed. Mr. Moody's previous neck x-rays were normal, but Dr. Patel stated that an x-ray will not show a herniated disk.
By his September 25, 1996 visit, Mr. Moody showed some improvement, but he was still having a sensory deficit in his lower extremities. Dr. Patel referred him to a neurologist. Mr. Moody saw Dr. Sanjeevi Tivarkaran, a neurosurgeon, on October 9, 1996. Dr. Tivarkaran did not report findings that indicated a herniated disk. He testified, however, that he was unaware that Mr. Moody had actually fallen after he was shocked, striking his head and neck. Dr. Tivarkaran further testified that, because he had an incomplete history from Mr. Moody, he could not rule out that Mr. Moody had a herniated disk at that time. He testified that that was also the reason he did not order further diagnostic tests.
On November 12, 1996, Mr. Moody again saw Dr. Patel and complained of stiffness and weakness in both of his hands and tenderness in his left wrist and forearm. His complaints were similar on January 30, 1997, with pain and stiffness in both hands, but more so in his left hand with pain also in his left elbow. Dr. Patel did not find evidence of neuropathy at that time.
Mr. Moody testified that, by this time, he and his supervisor realized he was unable to perform his job duties due to his weakness, pain and dizziness. He stated that, because he no longer had insurance, he did not return to see a doctor until March 2, 1998, due to the progressive weakness in both upper limbs, painful joints and his inability to hold objects. He was still suffering from weakness and aching in his legs as well. Dr. Patel found that Mr. Moody's strength in his legs had worsened from before. Mr. Moody was *297 also suffering from numbness in both upper limbs from his elbows down and was experiencing vision problems, chronic dizziness, sleeplessness and depression by this time. Dr. Patel found that Mr. Moody had both sensory and motor dysfunctions, primarily in his right arm, and referred him back to Dr. Tivarkaran for further testing.
Dr. Patel testified that Mr. Moody was exhibiting signs and symptoms consistent and significant to the later finding by the neurosurgeon of a disk herniation to the left of C5-6 and to the right of C6-7 (which was not repaired).
When asked why he had not found this before, Dr. Patel stated that, given Mr. Moody's overall neurological condition and the absence of a history of a fall, it was difficult for him to justify the cost of an MRI without the advice of a neurologist. He stated that he may have prescribed an MRI had he known of the earlier fall and possible trauma to Mr. Moody's neck. The EMG that was performed earlier would not have shown a compression of the vertebra in the neck. He opined that, if Mr. Moody had been totally normal prior to the electric shock, then something happened during that event which led to these problems and a slow or late onset of symptoms was not uncommon.
Dr. Brian K. Willis, neurosurgeon and Associate Professor of Neurosurgery at the Louisiana State University Medical Center, eventually performed surgery on Mr. Moody. He first saw Mr. Moody on December 22, 1998, following a second MRI, at which time Mr. Moody had complaints of bilateral upper extremity numbness, left arm weakness and a stiff neck, which indicated a progressive worsening over the two-year period. The new MRI showed degenerative arthritis, bone spurs and some flattening of the disks, but also a disk herniation on the left at C5-6 and a small herniation on the right at C6-7.
Dr. Willis stated that he only recommended surgery on C5-6 since Mr. Moody's symptoms were primarily on that side. He found that fusing more than one disc created instability and avoided doing so if at all possible. At that time, however, Mr. Moody declined surgery due to the associated risks. At a later exam, he did elect to have the surgery because his symptoms had somewhat increased. A third MRI performed on February 21, 2000, showed little, if any, change; but, by then, Mr. Moody was suffering from chronic headaches (which were becoming more severe), progressive weakness in his upper extremities and neck pain. Surgery was performed on March 29, 2000.
Dr. Willis testified that the mechanics of Mr. Moody's fall would be consistent with a trauma that could cause a herniated disk. Since Mr. Moody had none of the above symptoms prior to May 30, 1996, it was the opinion of Dr. Willis that it was more probable than not that the incident was the cause of the disk herniations.

General Damages
The jury awarded Mr. Moody general damages in the amount of $150,000. "General damages" are those which are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering. The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances *298 that the appellate court should increase or reduce the award. Id.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. DeYoung v. Simons, 32,378 (La. App.2d Cir.10/27/99), 743 So.2d 851; Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence, most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
Given the testimony of his treating physicians and their opinions of the cause of Mr. Moody's neck injury, we cannot say that the jury was manifestly erroneous in its award of general damages. Further, we find no merit in Defendants' speculation that Mr. Moody suffered his neck injury while at work. Mr. Moody actually suffered a work-related injury, a hernia, after he suffered the electric shock, for which he sought medical relief through workers' compensation. It is illogical to assume that he would then bypass that same recovery for a subsequent work-related neck injury when he was unable to afford medical treatment on his own. In fact, he eventually had to quit his job because of this injury, under which he would have been entitled to weekly benefits through workers' compensation as well as medical treatment. Instead, since he had no income, Mr. Moody eventually became unable to pay rent and lost his apartment for which he could not afford to pay, and he was forced to move with his daughters into his mother's home and seek welfare assistance.

Special Damages
"Special damages" are those which either must be specially pled or have a ready market value, that is, the amount of the damages supposedly can be determined with relative certainty, such as the plaintiffs medical expenses incurred as a result of the tort. Wainwright v. Fontenot, 00-0492 (La.10/19/00), 774 So.2d 70.
Regarding the standard of review for special damages, this court has stated:
The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Some special damages, such as medical and related expenses, cost to repair or replace damaged property, loss of wages, etc., are easily measured.... An award for past lost earnings, which are susceptible of mathematical calculation from documentary proof is not subject to the much discretion rule.
Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992); cited by White v. Wal-Mart Stores, Inc., 32,621 (La.App.2d Cir.3/3/00), 753 So.2d 995, writ denied, 00-1222 (La.6/23/00), 765 So.2d 1041.
In regard to Mr. Moody's past medical expenses, having found that his neck injury was related to the electric shock which he suffered from the Stove, any related medical expenses are recoverable as well as those expenses specifically associated with treatment he received in relation to the electric shock. We, therefore, will not disturb the $32,611 which the *299 jury awarded for his past medical expenses.
As to Mr. Moody's lost past and future wages, Dr. Luvonia Casperson, an economist, testified on behalf of Plaintiffs; and Dr. Kenneth Boudreaux, an economist, testified on behalf of Defendants. Awards for past lost wages are not susceptible to the great discretion given the factfinder, because past lost income is susceptible to mathematical calculation. Past lost income can be computed on an amount the plaintiff would, in all probability, have been earning at the time of trial; and damages for loss of past income are not necessarily limited to a multiplier of the amount earned at the time of injury. Kessler v. Southmark Corporation, 25,941 (La.App.2d Cir.9/21/94), 643 So.2d 345; Robbins v. State ex rel. Department of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991.
Despite the relative certainty of mathematical calculations, however, we are faced with differing sums from each economist. The jury has awarded Mr. Moody a sum which is between the two economists' calculations, but closer to Dr. Casperson's.
Dr. Casperson has a Ph.D. in economics with a minor in accounting and finance. She has taught at Louisiana State University-Shreveport for 24 years, chairing the economics department for 7 or 8 years. Dr. Casperson testified that past lost wages are those wages, inclusive of fringe benefits, from the date of injury to the date of trial. This figure is then subjected to a discount rate which takes into consideration inflation and other economic factors. A person's previous earning capacity is also taken into consideration.
Dr. Casperson stated that, in calculating Mr. Moody's past lost income, she used 3.96 years, the amount of time from the date of injury to the date of trial. Dr. Casperson determined that Mr. Moody was receiving approximately 21.4 percent of his salary in additional fringe benefits at the time he was injured. She lowered this figure, however, to 12 percent because she determined that the fringe benefits Mr. Moody was receiving while at ResourceNet were well above average in the industry in which Mr. Moody was employed. She, therefore, used the more conservative figure of 12 percent.
Dr. Casperson used $12 per hour to calculate Mr. Moody's actual lost wages and took into account those wages Mr. Moody earned from the time of injury to trial. Mr. Moody continued working at ResourceNet for a few months following the incident, returned to iron working for a few months and, after a year of not working, found jobs in the restaurant industry as a dishwasher, busboy and counterman. Mr. Moody's wage was $8.50 per hour when he left ResourceNet in August 1997 and $12 per hour at JJ Erectors where he did iron work until January 1998. Dr. Casperson included these wages, using earnings by Mr. Moody as reflected in his tax returns. Dr. Casperson also increased Mr. Moody's expected wage by three percent per annum after 1997 to reflect inflation. Using these sums and averages, Dr. Casperson calculated Mr. Moody's lost wages to be $60,283 and his lost fringe benefits to be $7,234.
Dr. Boudreaux, who also holds a Ph.D. in economics, and has been a professor of economics at Tulane University for over 30 years, based his calculations on Mr. Moody's wages at ResourceNet of $8.50 per hour. Dr. Boudreaux increased this amount by an inflation rate of three percent per annum, arriving at a post tax figure of $61,877 in lost wages from May 30, 1996, to the date of trial, exclusive of any actual wages earned. Dr. Boudreaux then subtracted from this figure the income *300 which Mr. Moody earned during that period of time according to his W 2s, arriving at an amount of $35,242. Dr. Boudreaux did not include loss of past fringe benefits in his calculations.
When asked if the figure would be different if he had considered Mr. Moody's last wage of $12 per hour as an iron worker, Dr. Boudreaux stated that, in his opinion, it would not be significantly different. In explaining his opinion, he stated that he figured the $8.50 wage in terms of a 40 hour week, 52 week per year job. He further stated, however, that in the construction industry, that is rarely the case since work is generally found to be per job and is dependent on weather conditions. Since iron working is a construction related occupation, Dr. Boudreaux opined that, using $12 per hour in calculating the earnings of a job which is active only about three fourths of a year, would not change the overall economic outcome.
The jury awarded a sum of $60,000 in past lost wages. This sum is between the figures given by each economist. Although the jury is not afforded as much deference when a sum is susceptible to a mathematical calculation, we cannot say that the jury was incorrect in arriving at this sum. Each economist presented plausible calculations, neither of which can be said to be wrong. We, therefore, will not disturb the jury's award of lost past wages.
Awards for loss of future income or future earning capacity, however, are inherently speculative and insusceptible of calculation with mathematical certainty. Odom v. Claiborne Electric Co-op., Inc., 623 So.2d 217 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1171 (La.1993); Kessler, supra. We conclude, therefore, that a greater deference is to be afforded a jury's conclusion. The factors to be considered in determining future lost income include the plaintiff's physical condition before and after his injury, his past work record and the consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of and the probability that he would have continued to earn wages over the balance of his working life. A loss of future income award is not really predicated upon the difference between the plaintiff's earnings before and after a disabling injury. Such an award is predicated, more strictly considered, upon the difference between the plaintiff's earning capacity before and after a disabling injury. Id.
In calculating Mr. Moody's lost future wages, Dr. Casperson estimated his life expectancy to be 35.1 years from the date of injury, or 75.99 years of age using the Statistical Abstract of the United States, a commonly accepted statistical source. In accordance with the Bureau of Labor Statistics, Mr. Moody's work life expectancy would be 61.09 years of age, 20.2 years from the date of injury or 16.24 years from the date of trial. She further determined that, if Mr. Moody were to work to the full Social Security retirement age of 66.17, he would work 21.32 years from the date of trial.
Dr. Casperson determined Mr. Moody's earning capacity to be $12 per hour based on his work as an iron worker, both before his injury and for a brief time following his injury. Dr. Casperson also called local steel erectors to determine the current wage and availability of work. The three percent annual increase was added to this $12 figure. Finally, Dr. Casperson calculated Mr. Moody's future wages for both 61.09 years of age and 66.17 years of age.
Including the 12 percent lost fringe benefits and a discount rate of 1.5 percent, Dr. Casperson estimated Mr. Moody's lost future earnings to age 60.9 to be $437,382. *301 Using the same figures, Mr. Moody's earning capacity to age 66.17 would be $553, 858. These figures were then offset by the minimum wage which totaled $265,607 for age 61.09 and $336,341 for age 66.17. Dr. Casperson testified that she felt Mr. Moody would retire from the work force at some time between the ages of 61.09 and 66.17. She stated an average of $300,974 would be reasonable.
Dr. Boudreaux, instead, determined that Mr. Moody's work life expectancy was 17.64 years from trial based on the Legal Economics tables which are derived from the census and the U.S. Bureau of Labor. He further determined that Mr. Moody's average annual income would be approximately $19,000. This amount was calculated out for an additional 17.64 years, increased at three percent per annum and discounted by approximately six percent for present value. Dr. Boudreaux explained that this figure of $181,579, which was after taxes, was the amount which Mr. Moody would have to currently place in a safe investment in order to receive about $19,000 per annum if he were totally disabled.
Assuming Mr. Moody could earn at least minimum wage in a 40 hour a week, 52 week job for that period of time, Mr. Moody would need $79,072 after taxes to supplement his income to reach $19,000 per year. Finally, Dr. Boudreaux considered the opinion of Dr. Lenora Maatouk, a vocational rehabilitation specialist, that Mr. Moody was capable of, and a expressed desire to become a journeyman. He would require 21-24 months of training and, upon completion, could earn an estimated $25,000 per year. Based on these figures, Dr. Boudreaux calculated Mr. Moody would only need to be compensated for the time he was being trained, which Dr. Boudreaux assumed for his calculations as 24 months. His calculations derived a sum of $27,012.
These calculations were all post-tax and did not include any loss of fringe benefits. Dr. Boudreaux explained that, because lump sum recoveries are not taxable, he was asked to include taxes. He also stated that, if Mr. Moody were able to work steadily at a full time job, even earning only minimum wage, he would likely be provided at least with group health insurance which is the largest percentage of the cost of fringe benefits. He, therefore, did not use any such figures in his calculations.
Again, we are faced with an award by the jury which is between Dr. Casperson's figures and above Dr. Boudreaux's lowest figure. Since we do not have the benefit of the motivation which powered the jury's decision-making process and the final award in between the given figures, we cannot say that the jury erred in awarding Mr. Moody $100,000 in lost future wages. Neither of the mathematical equations can be said to be unreasonable. Further, since we are to give great deference to the jury in awarding future lost income, we will not disturb this award.
The remaining awards to Mr. Moody's daughters have not been challenged by either party and, therefore, will not be disturbed.

CONCLUSION
For the reasons stated herein, the findings and awards of the jury below in favor of Plaintiffs, Robert Moody, individually and as tutor of the minors, Leah Nicole Moody and Lacey Brooke Moody, are affirmed. Costs are assessed equally to Defendants, Blanchard Place Apartments, Calhoun Property Management, Inc. and Clarendon National Insurance Company.
AFFIRMED.

*302 APPLICATION FOR REHEARING
Before NORRIS, C.J., BROWN, WILLIAMS, PEATROSS, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] Plaintiffs initially filed suit erroneously against Deep South Surplus, Inc. as the insurer of Blanchard Place Apartments and Calhoun Property Management, Inc.
[2] The burner box bottom is the sheet of metal which separates the stove from the oven and is insulated on either side to prevent the transfer of heat. This cooktop can be raised much like the hood of a car once the screws near the front of the appliance which hold it in place are removed.
[3] Mr. Weckerling's testimony and photographs were not presented to the jury because the trial court prohibited any evidence pertaining to Defendants' allegations of manufacturer defect from being placed before the jury since Third-Party Defendants had been dismissed from the claim. Defendants proffered this evidence.
[4] The grounding strap is designed to prevent the metal surface of a stove from becoming electrically charged in the event of an electrical short in its wiring. The uppermost portion of the strap is attached to a grounding post and the bottom most portion is to be attached to a grounding plate.
[5] Despite the lack of written reasons from the trial court, all parties acknowledged at oral argument that summary judgment was granted based on a finding by the trial court that Defendants (Third-Party Plaintiffs) could not carry their burden of proof, not as a sanction for spoliation.