793 So.2d 537 (2001)
Melba Louise Allen HUGHES, Plaintiff-Appellant,
v.
SCOTTSDALE INSURANCE COMPANY, et al, Defendants-Appellees.
No. 35,043-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*540 H. Russell Davis, Arcadia, James M. Johnson, Minden, Counsel for Appellant.
Ungarino & Eckert, by Wayne R. Maldonado, Michael J. Tarleton, Metairie, Counsel for Appellees Scottsdale Ins. Co. and Dewayne Lee.
Edward C. Jacobs, Springfield, Counsel for Appellee Charles Jurls.
Before NORRIS, WILLIAMS and STEWART, JJ.
STEWART, J.
The plaintiff, Melba Louise Allen Hughes Bamburg, filed suit after being injured in an automobile accident. The jury assessed her with fifty percent of the fault and awarded her general damages of $5,000 and special damages of $10,000, both reduced by her percentage of fault. The trial court ordered her to pay the defendants' court costs. The plaintiff now appeals the jury's finding of fault and seeks an increase in the damages awarded. She also appeals the trial court's assessment of costs to her. After careful review of the record, we reverse the jury's assessment of fault to the plaintiff, amend the judgment to increase the amount of general damages awarded, and assess all costs of this proceeding to the defendants.

FACTS
At dusk on November 1, 1989, the plaintiff was traveling south on U.S. Highway 371 near Springhill when her vehicle struck the gin pole on the back of a log truck as it was executing a left hand turn *541 while traveling north on the same highway. The log truck was being driven by Charles Jurls, who was returning home to Arkansas after having delivered a load of logs for his employer, Dewayne Lee, to the International Paper Company.
The plaintiff was transported by ambulance to a hospital in Springhill and then to Schumpert Medical Center in Shreveport where she was treated by Dr. George Beach, a neurosurgeon. The plaintiff complained of pain in the back of her neck extending down to the base of her neck and between her shoulder blades. Dr. Beach's initial impression was that she sustained a cervical strain. During her hospital stay, the plaintiff also complained of pain around her thorax, which Dr. Beach described as mid-dorsal pain radiating from the back to the front. All x-rays were negative. Her discharge diagnosis was cervical and thoracic strain. Upon release from the hospital, she was advised to stay off work for two weeks.
After her release from the hospital, the plaintiff stayed with her parents and did not return to work. She began experiencing headaches and tingling in her arms and legs and sought treatment from Dr. Donald R. Smith, a neurosurgeon, whom she saw on November 27, 1989 and January 5, 1990. Dr. Smith found some limitation in the plaintiff's cervical range of motion, but no neurological deficits. He concluded that she suffered a probable cervical strain and released her to return to full unrestricted activities as of January 8, 1990.
The plaintiff returned to her job at Standard Manufacturing on January 10, 1990. She worked on light duty for two or three days during which time she placed wires inside of air conditioner units. She passed out at work and did not return. However, she lost her job due to her failure to timely provide a doctor's excuse. She did not lose her job as a result of any medical condition.
On January 23, 1990, the plaintiff sought treatment from Dr. Baer Rambach, an orthopaedic surgeon. She complained of pain in her right shoulder and arm, pain in her neck, and intermittent headaches. There was tenderness in her upper and lower back. Dr. Rambach's impression was that the plaintiffs back and neck pain was secondary to contusions and myoligamentous strains in the cervical and dorsal spine. He recommended physical therapy. When he saw the plaintiff again on February 20, 1990 and March 20, 1990, her problems appeared to be resolving. However, the plaintiff reported an increase in symptoms during her next visit on June 26, 1990. The plaintiff also reported that she had undergone breast surgery and had contracted scarlet fever since her last visit. The breast surgery was performed on March 27, 1990, by Dr. John P. Valiulis, a plastic surgeon. Dr. Valiulis described the surgery as a combination breast reduction and selective subcumastectomy, which involved the removal of some breast tissue and the addition of silicone implants. He explained that the surgery was performed to relieve pain that the plaintiff was experiencing due to the size of her breasts and fibrocystic breast disease, which she had been diagnosed with in 1979. At the same time, the plaintiff also underwent an abdominal scar revision as a follow-up to a gastric stapling procedure that she had previously undergone.
Dr. Rambach treated the plaintiff seven more times through December 1990, with no improvement in her condition during this period. She generally complained of pain in her lower back, neck, arms, shoulders, hips, and legs. By October 1990, Dr. Rambach came to suspect that the plaintiff might be suffering from fibromyositis or fibrositis, which is currently referred to as *542 fibromyalgia, and referred her to Dr. Robert E. Goodman, a rheumatologist. The plaintiff did not see Dr. Goodman until July 29, 1991, at which time he concluded that she suffered from fibromyalgia, which he described as pain in the muscles and connective tissues.
The instant suit was filed by the plaintiff on October 26, 1990. The matter proceeded to a five-day jury trial against defendants Scottsdale Insurance Company and Charles Jurls beginning on October 16, 2000.[1] The plaintiff attempted to prove that she was disabled as a result of the accident due to fibromyalgia and entitled to damages for the economic losses she suffered. She also attempted to prove that the accident necessitated the breast surgery and caused her to suffer postconcussive syndrome. The jury apparently rejected the majority of the plaintiffs claims as indicated by its award of general damages in the amount of $5,000 and special damages in the amount of $10,000. The jury also found that the plaintiff and Charles Jurls were each fifty percent at fault in causing the accident. In addition, the trial court assessed all court costs to the plaintiff based on a procedure whereby the defendants were required to submit a sealed settlement offer to the trial court at the start of trial. Because the jury awarded the plaintiff less than the amount in the sealed offer, the trial court assessed all costs to the plaintiff.

DISCUSSION
The plaintiff asserts three assignments of error on appeal. First, the plaintiff contends that the jury committed manifest error in assessing her with fifty percent of the fault in causing the accident. Second, the plaintiff contends that the jury erred in awarding her grossly inadequate damages. Third, the plaintiff contends that the trial court improperly assessed all court costs to her. We will address each of these assignments of error.

Allocation of Fault
The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607; Holt v. State Through Dept. of Transp. and Development, 28,183 (La.App.2d Cir.4/3/96), 671 So.2d 1164, writ denied, 96-1132 (La.6/21/96), 675 So.2d 1080. An appellate court may reallocate fault only after finding an abuse of discretion and then only to the extent of lowering or raising the percentage of fault to the highest or lowest point reasonably within the trial court's discretion. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612; Holt v. State Through Dept. of Transp. and Development, supra.
Analysis of both parties' conduct is necessary for a proper allocation of fault. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985). The following factors are to be considered when apportioning fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior; and

*543 (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
Watson, supra.
In addition, the burden is on the plaintiff in a civil suit to prove the negligence of the defendant by a preponderance of the evidence. Miller v. Leonard, 588 So.2d 79 (La.1991); Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418.
In this instance, the accident occurred when the defendant, Charles Jurls, made a left turn across the southbound lanes of travel along U.S. Hwy. 371. A driver making a left turn has a statutory duty to "yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard." La. R.S. 32:122. A left turn is one of the most dangerous maneuvers a driver may execute and requires the exercise of great caution. Before attempting a left turn, a driver should ascertain whether it can be completed safely. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Holt, supra; Silva v. Calk, supra.
In a vehicular collision case, the plaintiff is afforded the benefit of a presumption of the defendant's negligence when the plaintiff proves that the defendant executed a left turn and crossed the center line at the time of impact. Miller v. Leonard, supra; Holt, supra; Silva v. Calk, supra. The burden rests heavily on the left-turning motorist to explain how the accident occurred and to show that he is free of negligence. Miller v. Leonard, supra.
The defendant, Charles Jurls, did not appear at trial and did not testify. Instead, his deposition was introduced into evidence. At his deposition, Jurls stated that he was driving north along U.S. Hwy. 371 when he turned left into the parking lot of a "tire place." He could not say whether he saw the plaintiff's vehicle, but he did state that it was dark and that he saw headlights. He did not stop before making the left turn, but he did slow down. He stated that he had "plenty of room" to make the turn and that he "had enough room to get there before the car got there." Jurls was driving a vehicle with a twenty-five foot trailer behind it. The gin pole extended an additional six to eight feet behind the rear axle of the trailer. The pole had a flag on the end of it. Jurls believed that his vehicle was still moving when the impact occurred. He believed that his rear axle had left the southbound lanes of travel and that only the pole was extending into the roadway when the plaintiff's vehicle collided with it.
The only other witness to the accident was the plaintiff. She testified that she was driving about thirty-five or forty miles per hour in a speed zone of forty-five miles per hour and that her headlights were activated. Prior to the accident, she passed an older couple traveling beside her in the southbound lanes. She testified that she did not see Jurls' vehicle before the accident. Her only memory is seeing something in the windshield which she described as a red cloth on the end of a pole. She tried to swerve, but she did not have enough time to do so.
In light of these facts, we find that the jury committed manifest error in allocating fifty percent of the fault in causing the accident to the plaintiff. Nothing in evidence establishes negligence on the part of the plaintiff. Rather, the evidence establishes that Jurls bears the fault for the accident. In his deposition, Jurls admitted to making a left turn across two lanes of travel in the face of oncoming headlights. The fact that Jurls was driving a vehicle over twenty-five feet in length with an *544 unlit pole extending an additional six to eight feet at the rear must be considered in assessing the risk he created by making the left turn at dusk in the path of oncoming vehicles. It is obvious that Jurls did not have sufficient time to clear the two southbound lanes of travel. Jurls could have stopped his vehicle and waited until he was certain that the path was clear before making the left turn. There were no extenuating circumstances requiring him to proceed in haste without first ascertaining whether the maneuver could be completed safely. These considerations require us to now reverse the jury's allocation of fault and hold that the defendant, Charles Jurls, bears sole fault in causing the accident at issue.

Damages
The plaintiff contends that the damages awarded by the jury are inadequate in that the award is commensurate with an award appropriate for soft tissue injuries of a short duration. According to the plaintiff, the evidence proves that she suffered fibromyalgia from the trauma of the accident, that she experienced exacerbation of pre-existing fibrocystic breast disease and had to undergo breast surgery as a result of the accident, and that she suffered from migraine headaches and post-concussion syndrome caused by the accident. The plaintiff seeks an increase in general damages as well as an award of special damages for economic losses due to disability and diminution in earning power, for loss of non-market services, and for future medical expenses. She also seeks an award of the full amount of medical expenses incurred in the treatment of the alleged injuries.
In a personal injury suit, the plaintiff bears the burden of proving a causal connection between the accident and the alleged injuries. Harper v. Garcia, 32,142 (La.App.2d Cir.8/18/99), 739 So.2d 996; Merrells v. State Farm Mut. Auto. Ins. Co., 33,404 (La.App.2d Cir.6/21/00), 764 So.2d 1182. This burden is satisfied by proving through medical and lay testimony that it is more probable than not that the injury was caused by the accident. O'Riley v. City of Shreveport, 30,107 (La.App.2d Cir.1/23/98), 706 So.2d 213, writ denied, 98-0752 (La.5/1/98), 718 So.2d 418. Whether the accident caused the plaintiff's injuries is a factual question which should not be reversed on appeal absent manifest error. Harper v. Garcia, supra.
The record establishes that the plaintiff suffered a soft tissue injury caused by the accident. This is supported by medical testimony. However, the jury's low award of damages indicates that they rejected the plaintiff's contention that both the fibromyalgia and breast surgery were caused by the accident. With regard to these two items, the jury was presented with conflicting evidence from medical experts.
Upon admission to Schumpert Medical Center following the accident, the plaintiff was treated by Dr. George Beach, a neurosurgeon, who testified at trial. There were initial concerns that the plaintiff may have suffered a cervical spine fracture. However, after examining the plaintiff, Dr. Beach concluded that she suffered a probable cervical strain secondary to the motor vehicle accident. He testified that the plaintiff experienced a brief loss of consciousness. However, the exam revealed no evidence of trauma, and both the neurological exam and x-rays were normal. Two days after her admission to the hospital, the plaintiff complained of pain around her thorax, which Dr. Beach described as mid-dorsal pain with radicular pain around her thorax. He placed the location of this pain in the chest area down below the rib cage and toward the belly button. An *545 MRI and x-rays of the thoracic spine were normal. The plaintiff's final diagnosis at discharge was a cervical and thoracic strain secondary to the motor vehicle accident. While in the hospital, the plaintiff only complained of pain in her neck, thoracic spine, and the area between her shoulder blades. Dr. Beach testified that she had a low level of pain during her hospital stay and that there was no indication of fibromyalgia symptoms.
After her release from the hospital, the plaintiff sought treatment from another neurosurgeon, Dr. Donald R. Smith, on November 27, 1989 and January 5, 1990. Dr. Smith did not testify at trial, but two depositions given by him were introduced into evidence as exhibits for the defense. At the plaintiff's first visit, Dr. Smith found that she exhibited some limitation in the cervical range of motion, but that she had no neurological deficit or abnormalities. He concluded that she had likely sustained a mild cervical strain, which he believed to be a relatively short term problem which would clear up within two or three weeks. He opined that even a severe strain should resolve itself within two or three months. Dr. Smith noted that the plaintiffs subjective complaints did not correlate to objective physical findings. He believed that her symptoms may have been magnified by anxiety. When Dr. Smith examined the plaintiff on January 5, 1990, her condition was improved. She exhibited a normal range of motion. He gave the plaintiff clearance to return to full and unrestricted activities, including work, effective January 8, 1990. Dr. Smith also testified at his deposition that he would not relate a fibromyalgia diagnosis to the vehicular accident.
On January 23, 1990, the plaintiff sought treatment from Dr. Baer Rambach, an orthopaedic surgeon. According to Dr. Rambach's deposition, which was introduced into evidence, the plaintiff complained of headaches and pain in her neck and back extending to her right shoulder and arm. Dr. Rambach concluded that the plaintiff was experiencing discomfort due to sprains of the cervical spine and dorsal spine areas. He recommended physical therapy. The plaintiff returned to Dr. Rambach on February 20, 1990, again complaining of headaches, back pain, and neck pain. However, Dr. Rambach found some improvement in her neck condition. He recommended that she consult a neurologist about the headaches. Dr. Rambach saw the plaintiff again on March 20, 1990, at which time her problems appeared to be resolving. She was experiencing less discomfort in her neck and lower back, and she had a better range of motion. However, she was still experiencing headaches.
The plaintiff did not return to Dr. Rambach again until June 26, 1990, at which time she reported an increase in symptoms and complained of pain in her lower back, right leg, and between her shoulder blades. She also reported to Dr. Rambach that she had undergone breast surgery and that she had suffered an episode of scarlet fever. Thereafter, the plaintiff continued to report symptoms of low back pain and neck pain, as well as problems with her arms and shoulders and tingling sensations in her feet. On August 21, 1990, Dr. Rambach found that the plaintiff was experiencing severe low back pain and neck pain with generalized tenderness in her cervical and lumbosacral spine regions. He believed that she was experiencing an acute exacerbation of the pain and discomfort that she had been experiencing all along. However, by the plaintiffs next visit on October 2, 1990, he noted the possibility that her problems might be attributable to "fibromyositis," which he described as persistent pain and discomfort over a long period of time, possibly caused *546 by trauma. Dr. Rambach again referred to fibromyositis as a possible diagnosis of the plaintiffs condition at her visit on October 25, 1990. However, he did not believe that his expertise as an orthopaedic surgeon qualified him to make fibromyositis a final diagnosis, so he referred the plaintiff to a rheumatologist.
While Dr. Rambach believed that fibromyositis, or fibromyalgia, might explain the plaintiffs complaints and symptoms, he did not give an opinion as to the cause of the condition or relate it to the vehicular accident at issue. It is also notable that Dr. Rambach found the plaintiffs condition to be improving through her March 20, 1990 visit, after which time she began reporting an increase in symptoms and complaints.
Although Dr. Rambach referred the plaintiff to a rheumatologist, she did not consult one until July 29, 1991, when she was examined by Dr. Robert E. Goodman. Dr. Goodman confirmed the diagnosis of fibromyalgia after conducting the "tender point" exam. This exam requires the patient to report pain upon palpitation of eleven of eighteen trigger points located in specified anatomical areas. Dr. Goodman referred to possible causes of fibromyalgia as trauma, stress or emotional trauma, interference with sleep patterns, excessive caffeine, irritable bowel syndrome, and menopause. He believed that the trauma of the vehicular accident caused the plaintiffs condition. However, he also opined that a "fairly significant trauma" would be required to precipitate fibromyalgia. Furthermore, he was not aware of the fact that the plaintiffs condition consistently improved through March 1990 while she was under the care of Dr. Rambach.
The plaintiffs fibromyalgia diagnosis was also confirmed by Dr. Laura Susan Priori and Dr. Keith Ashby. Dr. Priori, an internal medicine specialist whose deposition was introduced into evidence, treated the plaintiff beginning on May 13, 1997. Based on the history reported by the plaintiff, Dr. Priori believed that the plaintiff had suffered a closed head trauma with short term memory loss and mood swings, headaches, and breast injury which required surgery-all as a result of the accident. While Dr. Priori diagnosed the plaintiff with fibromyalgia, she could not say that it was caused by the vehicular accident of November 1, 1989. She listed possible causes of fibromyalgia as being emotional stress, illness, surgery, thyroid disease, trauma, sleep disorders, viral infections, psychological factors, muscle abnormalities, and autonomic nervous system dysfunction among others. Dr. Priori admitted that the plaintiffs fibromyalgia could have been caused by the accident, the breast surgery and abdominal scar revision, the infections suffered by the plaintiff after her surgery, the silicone breast implants, or emotional stress. Dr. Priori stated that there was no way for her to differentiate among these possible causes to determine the exact cause of the plaintiff's condition.
Finally, Dr. Keith Ashby, an internist who began treating the plaintiff on December 5, 1995, also confirmed the diagnosis of fibromyalgia. His video deposition was introduced into evidence. Although the plaintiff reported to Dr. Ashby that she had fibromyalgia following a vehicular accident, Dr. Ashby did not specifically testify that the plaintiffs condition was related to the motor vehicle accident of November 1, 1989.
In addition to the testimony of the above medical experts, there was also testimony on behalf of the defendants from Dr. Evan Park Howell, a neurologist, who examined the plaintiff on October 26, 1999, and reviewed numerous medical records. He testified that the plaintiff reported that she *547 experienced fibromyalgia, migraine headaches, and memory loss as a result of the vehicular accident. She also reported that the accident caused cysts in her breasts to rupture and that this required surgery. Dr. Howell discounted the diagnosis of fibromyalgia by stating that there is no scientific proof that the condition exists. He referred to the diagnosis as "sloppy medicine" and opined that it is simply another manifestation of depression. Dr. Howell did conclude that the plaintiff sustained cervical and lumbosacral strains as a result of the accident and that her symptoms should have resolved within one year. He also concluded that she suffered a mild concussion with some post-traumatic amnesia and headaches. However, he believed that these conditions, to the extent that they were precipitated by the accident, should have also resolved within six to twelve months after the accident. He opined that any continuing problems would not be related to the accident.
Where testimony of the experts differ, the trier of fact is responsible for determining which evidence is the most credible. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Theriot v. Lasseigne, supra. Such credibility determinations are subject to the manifest error standard which requires great deference for the trier of fact's findings. Theriot v. Lasseigne, supra. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993).
Although the plaintiff was diagnosed with fibromyalgia, we cannot say that the jury was manifestly erroneous or clearly wrong in rejecting her contention that this condition was caused by the accident. Only Dr. Goodman's testimony can be cited for support for the claim that the accident caused the plaintiff to develop fibromyalgia. However, Dr. Goodman's diagnosis was made approximately one and a half years after the accident occurred and after the plaintiff had undergone breast and abdominal scar revision surgery and other hospitalizations for infections related to the surgery. Dr. Rambach suspected that the plaintiff developed fibromyalgia; however, he suspected this only after the plaintiff's symptoms worsened in the months following the breast and abdominal scar revision surgery on March 27, 1990. Prior to this time, the plaintiffs symptoms had improved. No other physician testified that the accident caused the plaintiff to develop fibromyalgia. Furthermore, the witnesses referred to numerous possible causes of fibromyalgia, including trauma from surgery. Faced with the conflicting medical testimony presented at trial, we find no error in the rejection of the claim for damages attributable to fibromyalgia.
We also find no error in the apparent rejection by the jury of the plaintiffs claim for damages related to the breast surgery. The plaintiffs claim that the accident aggravated pre-existing fibrocystic breast disease is simply not supported by the record. The plaintiff testified that she struck her chest in the accident, but she admitted on cross examination that she did not know whether she remembered striking her chest in the accident. The only other indication of injury to the plaintiff's breasts was the testimony of Charles Bamburg, her boyfriend at the time of the accident and her husband at the time of trial. Bamburg testified that he saw a bruise on the plaintiffs right breast when he brought her a new nightgown four days after her release from the hospital. Contrary to the plaintiffs claim that she injured her breasts in the accident, neither the medical records nor the medical testimony *548 refers to injury of the breasts. In fact, Dr. John Valiulis, the plastic surgeon who performed the surgery, testified that the purpose of the surgery was to alleviate pain due to the size of the plaintiffs breasts and the presence of fibrocystic breast disease. He did not testify that the accident aggravated the fibrocystic breast disease in any way. He did not recall any mention of a vehicular accident, and he stated that he was not thinking about any accident in relation to the performance of the surgery. Dr. Valiulis also could not say that the accident either exacerbated the pre-existing fibrocystic breast disease or necessitated the surgery. Based on the record, the plaintiff failed to prove by a preponderance of the evidence that the accident caused injury to her breasts or aggravated a pre-existing condition.
In addition to the evidence that the plaintiff suffered soft tissue injuries as a result of the accident, there was also evidence that the plaintiff suffered headaches and post-concussion syndrome caused by the accident. Thomas Elwin Staats, Ph.D., is a clinical neurologist who examined the plaintiff on December 5, 1994. The plaintiff reported to him that she lost consciousness after the accident, that she had a spotty memory for several months after the accident, and that she continues to have some memory problems. Dr. Staats concluded that the plaintiff suffered a mild post-concussion syndrome. Dr Staats found no measurable brain damage of a permanent nature and no intellectual impairment. However, he did find that the plaintiff exhibited weaknesses in attention and some motor functions and was perhaps unable to function as efficiently as she had in the past. He noted that her condition could be helped with medication. Dr. Staats also noted that the plaintiffs condition was not sufficiently severe so as to prevent her from working.
In assessing damages in cases of offenses, quasi-offenses, and quasi-contracts, much discretion is left to the trier of fact. La. C.C. art. 2324.1. The trier of fact's award of general damages should not be overturned absent an abuse of discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). To determine whether the trier of fact abused its discretion in making an inadequate award, the evidence must be viewed in the light most favorable to the defendant. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987). Guidance from prior awards only becomes relevant after an articulated factual analysis discloses an abuse of discretion. Youn v. Maritime Overseas Corp., supra.
The accident caused the plaintiff to suffer soft tissue injuries, headaches, and post-concussion syndrome involving some memory loss and efficiency impairment. From our review of the expert testimony, it is fair to conclude that the plaintiff suffered the effects of her injuries for up to a year after the accident. Even in 1994, at the time of her examination by Dr. Staats, the plaintiff was still exhibiting some of the effects of post-concussion syndrome. The plaintiff had to be hospitalized for treatment after the accident. She underwent x-rays, MRI's, and physical therapy. Under the facts of this case, the jury's award of only $5,000 in general damages is inadequate. We find that an award of general damages in the amount of $20,000 is the lowest amount we can grant to compensate the plaintiff for the mental and physical pain and suffering, inconvenience, and other lifestyle losses she endured as a result of her injuries from the accident.[2]
*549 The evidence does not support an additional award of special damages for any alleged economic losses. The plaintiff failed to show that she was prevented from working because of her injuries from the accident. Furthermore, the plaintiff based her claims for special damages for economic loss and loss of non-market services on her alleged disability due to fibromyalgia, a condition which was not proven to be related to the accident. Finally, the evidence does not support an award of increased medical expenses.

Assessment of Costs
The plaintiff asserts that the trial court abused its discretion in assessing all court costs to her. We agree. La. C.C.P. art. 1920 sets forth the procedure for taxing court costs against litigants and provides as follows:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
The trial court has great discretion in determining and allocating court costs. Hunter v. Bossier Medical Center, 31,026 (La.App.2d Cir.9/25/98), 718 So.2d 636. However, the general rule is that costs are to be paid by the party cast in judgment. Clark v. Laird, 458 So.2d 639 (La.App. 3d Cir.1984), writ denied, 462 So.2d 210 (La. 1985). The prevailing party is generally not taxed with costs unless he incurred additional costs pointlessly or engaged in other conduct which would justify assessment of costs against him. Penton v. Schuster, 98-1068 (La.App. 5th Cir.3/30/99), 732 So.2d 597; Laughlin v. Breaux, 515 So.2d 480 (La.App. 1st Cir. 1987).
The trial court assessed costs against the plaintiff based on a sealed settlement offer submitted by the defendants to the trial court before the start of trial. It was understood that costs would be assessed against the plaintiff if the jury's verdict was less than the defendants' sealed offer. At the close of trial, the trial court opened the sealed envelope and revealed the settlement amount to be $75,000, an amount which the defendants had offered to settle with the plaintiff during negotiations prior to trial. Because the plaintiff opted to go to trial instead of accepting the defendants' settlement offer, she was penalized by the trial court with payment of the defendants' court costs.
We do not find the trial court's procedure of assessing court costs to be equitable as required under La. C.C.P. art. 1920. Consequently, we find the trial court abused its discretion in ordering the plaintiff to pay the defendants' court costs. *550 Because the trial court abused its discretion in its assessment of court costs and because we have reversed the jury's assessment of fault against the plaintiff, we now reverse that portion of the judgment ordering the plaintiff to pay all of defendants' court costs and assess all costs of this proceeding against the defendants.

CONCLUSION
For the reasons mentioned, we reverse the jury's assessment of fault against the plaintiff and hold that the defendant, Charles Jurls, was solely at fault in causing the accident. We also amend the award of general damages by increasing it to $20,000. Finally, we reverse the assessment of costs against the plaintiff and hereby assess all costs of this proceeding to the defendants.
REVERSED IN PART, AMENDED IN PART AND AFFIRMED.
NOTES
[1] Scottsdale Insurance Company is the insurer of the defendant, Dewayne Lee, who died during the course of this litigation.
[2] For similar awards, see Sims v. State Farm Auto. Ins. Co., 30,602 (La.App.2d Cir.5/13/98), 714 So.2d 132, review granted, 98-1613 (La.10/9/98), 726 So.2d 13, modified by, 98-1613 (La.3/2/99), 731 So.2d 197, awarding $20,000 for eleven months of treatment for headaches and neck pain associated with a mild cerebral concussion and cervical sprain/ strain; Whited v. Home Depot U.S.A, Inc., 27,938 (La.App.2d Cir.8/3/96), 712 So.2d 97, awarding $30,000 for chronic pain associated with cervical and lumbosacral strain, anxiety and depression associated with chronic pain, and recurrent headaches up to two years post-accident; Coley v. State, Through DOTD, 621 So.2d 41 (La.App. 2d Cir.1993), awarding $20,000 for concussion, headaches, neck pain, and blurred vision; Gage v. Potts, 94-1542 (La.App. 1st Cir.4/7/95), 653 So.2d 1183, awarding $15,000 for cervical and lumbar strain with abdominal contusions treated for up to one year; and Buras v. Neipman, 98-2703 (La.App. 4th Cir.5/12/99), 735 So.2d 841, awarding $30,000, decreased on appeal from $50,000, for a four to five month cervical strain possibly overlying a cervical degenerative disc disease.