833 So.2d 1166 (2002)
Theresa Traylor COLLINS, Plaintiff-Appellee,
v.
SHELTER MUTUAL INSURANCE COMPANY, et al, Defendants-Appellants.
No. 36,528-CA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 2002.
*1168 Hudson, Potts & Bernstein, by Brady D. King, Monroe, for Appellant, Shelter Mutual Ins. Co.
Clifford L. Lawrence, Jr., for Appellee, Theresa Traylor Collins.
Before STEWART, KOSTELKA and DREW, JJ.
STEWART, J.
Shelter Mutual Insurance Company, ("Shelter"), appeals an award of general and special damages to Theresa Traylor Collins[1] for injuries she sustained in an automobile accident in 1991. Theresa seeks an increase in damages for future medical expenses and for lost past and future wages. We amend the trial court's judgment in part and affirm as amended.

FACTS
On July 3, 1991, Theresa was involved in an automobile accident at the intersection of Tower Drive and North 19th Street in Monroe, Louisiana. Theresa's 1990 Toyota Camry was struck on the right front passenger side by a Lincoln Town Car driven by Kent Breard, Sr., who was insured by Shelter.[2] The impact pushed Theresa's vehicle slightly across the center line of the roadway. At the time of the accident, Theresa was returning to the Oral Surgery Center where she was employed as a surgical assistant by Dr. Ray Rhymes. Theresa and a group of co-workers were leaving that afternoon for a weekend trip to Florida. Theresa began having a headache and pain in her neck and shoulder area before leaving for the trip. She was given pain medication by a physician with whom she worked. The pain progressed over the weekend, so Theresa returned home a day early.
About two weeks later, Theresa sought medical treatment from Dr. Stephen Brazzell, a family physician. Dr. Brazzell prescribed muscle relaxers and anti-inflammatory *1169 medications and placed Theresa in physical therapy. He ordered x-rays and a CT scan, all of which were normal. When Theresa's condition did not improve, Dr. Brazzell referred her to Dr. Douglas Brown, of the Orthopeadic Clinic of Monroe.
Theresa saw Dr. Brown from October 1991 through March 1992. Dr. Brown continued Theresa on medications for pain and placed her on a new physical therapy regimen. He initially believed that her complaints stemmed from a congenital condition known as thoracic outlet syndrome and referred her to a physician with expertise in that area for surgical evaluation; however, there was no need for surgery. He finally diagnosed Theresa's condition as a soft tissue injury of the neck and dorsal spine. By March 1992, Dr. Brown believed that Theresa's condition had stabilized as a result of therapy. He could offer her nothing more than a referral to Psychological Associates for an evaluation and for biofeedback and relaxation techniques to help her cope with the discomfort of her injury. Theresa was also treated in May 1992 by Dr. Donna Donald, an internal medicine specialist, for pain and depression.
In June 1992, Theresa began treatment with Dr. Ferrall Endsley, a doctor of osteopathy with certifications in physical medicine and rehabilitation. Theresa came under Dr. Endsley's care when she was referred to him by the psychologist to whom Dr. Brown had sent her for pain management techniques. Dr. Endsley placed Theresa in a two-week inpatient program for chronic pain sufferers. Treatment included medications for pain, depression and sleeping, physical and occupational therapy, and counseling. Though Theresa's condition improved while in the inpatient program, the pain increased during the weeks following her discharge. Dr. Endsley's diagnosis was cervical and trapezius muscle strain with chronic pain. He also believed she would be subject to depression and anxiety because of the pain. His prognosis was that Theresa would continue to have pain off and on for the rest of her life. Theresa saw Dr. Endsley for her condition until September 1993.
Thereafter, Theresa did not seek further professional treatment for some time. She continued working and adjusted her daily schedule to accommodate the ongoing pain. She treated herself with hot baths or whirlpools two or three times a day. She used hot and cold packs to ease the pain in her neck and shoulder. She spent part of her lunch hour resting at the office or the park with a hot or cold pack placed on her neck and shoulder. She had difficulty sleeping. Because of the injury, she could not help care for her grandchild, who had been born with cerebral palsy. She could no longer enjoy bowling as she did before the accident. However, she did participate in line dancing a couple of times a week and began occasionally playing pool with friends. Theresa also continued to take pain medications.
By the time of trial in January 2001, Theresa was still experiencing significant pain and had begun treatment with Dr. Greg Vigna, a physical medicine and rehabilitation specialist. Dr. Vigna believed that Botox injections might alleviate some of Theresa's pain, and he had completed the first course of injections just prior to the time of trial.
At issue before the trial court was causation, the extent of Theresa's injury, and damages. Liability was not at issue as Kent Breard, Sr., was recognized to have been at fault in the accident. Shelter sought to show that Theresa's injures were pre-existing or due to other causes. She had been treated for TMJ in years preceding *1170 the accident, and she had twisted her knee in a fall just days before the accident. She had also been involved in another automobile accident in 1994. Shelter sought to attribute Theresa's depression to a divorce that became final in 1992, and it sought to show that Theresa abused prescription drugs.
After three days of testimony and the presentation of numerous exhibits into evidence, the trial court found the accident at issue to be the cause of the injuries complained of since 1991. The court found it plausible that Theresa gave up on treatment after failing to obtain relief. The court also believed that any intervening incidents merely aggravated Theresa's condition. The trial court awarded general damages of $150,000 after taking into account the severity, continual nature, and psychological effects of the pain, the inconvenience to Theresa at home and work as a result of the pain, and the probability that she will never completely recover. The trial court awarded past medical expenses of $22,747. The trial court also awarded future medical expenses of $30,000. The trial court rejected Theresa's claim for lost income, but the trial court did award her $20,000 for future loss of wages upon concluding that her work may be curtailed if she continues to suffer from her injuries.
Shelter appealed the trial court's judgment, asserting that the trial court abused its discretion in finding the accident was the cause of Theresa's complaints after 1992, in awarding excessive general damages, in awarding past medical expenses for treatment after 1992, in awarding future medical expenses, and in awarding future lost wages. Theresa answered the appeal to seek an award for past lost wages and an increase in the amounts awarded for loss of future wages and future medical expenses.

DISCUSSION

Causation
A trial court's factual findings are accorded great weight and will not be disturbed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). It is the duty of the trier of fact to weigh credibility and to accept or reject all or part of a witness's testimony. Welch v. Winn-Dixie Louisiana, Inc., 94-2331 (La.5/22/95), 655 So.2d 309; Marshall v. Caddo Parish School Board, 32,373 (La. App.2d Cir.10/29/99), 743 So.2d 943. Where there is a conflict in the testimony, reasonable evaluations of credibility should not be disturbed on appeal. Rosell, supra. Where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
In a personal injury suit, the plaintiff bears the burden of proving a causal connection between the accident and the alleged injuries. Hughes v. Scottsdale Ins. Co., 35,043 (La.App.2d Cir.8/22/01), 793 So.2d 537; Harper v. Garcia, 32,142 (La.App.2d Cir.8/18/99), 739 So.2d 996. Furthermore, a plaintiff must prove causation by a preponderance of the evidence. Morris v. Orleans Parish School Board, 553 So.2d 427 (La.1989); Marshall, supra. The burden is met by proving through medical and lay testimony that it is more probable than not that the injury was caused by the accident. Hughes, supra. Whether the accident caused the plaintiff's injury is a factual question subject to the manifest error standard of review. Id.
Shelter argues that the trial court abused its discretion in finding a causal connection between the accident of July 3, 1991, and the plaintiff's complaints after *1171 1992. Theresa had a history of TMJ and had fallen days before the accident. She was involved in another vehicular accident in 1994, and she had medical treatment for other conditions. Shelter asserts that any injury Theresa suffered from the accident at issue was minor and limited in time.
From our review of the record, we find no error in the trial court's finding that the accident caused the soft tissue injuries that Theresa complained of through the time of trial. Neither the history of TMJ nor the fall prior to the accident was shown to have caused the ongoing symptoms of neck and shoulder pain which Theresa began experiencing within hours of the accident. Although Mary Traylor, the plaintiff's sister, testified that Theresa had hurt her back while in school, Traylor admitted that she does not have a close relationship with Theresa. Moreover, there was no other evidence to corroborate Traylor's claims. There was also no evidence that the subsequent accident in 1994 did anything other than temporarily aggravate Theresa's condition.
In meeting the burden of proof, Theresa did establish that she began experiencing neck and shoulder pain shortly after the accident. Her symptoms remained consistent and continued throughout the ensuing years. These facts were proven by testimony of Theresa, as well as that of her friends, family, co-workers, and healthcare providers. The medical evidence shows that Theresa sought treatment, but obtained little relief. She adjusted to living with the ongoing pain. As will be discussed further in connection with the award of general damages, there was ample evidence that Theresa's injury may be a lifetime condition.
Both the medical and lay testimony establish more probable than not that the accident caused injury to Theresa's neck and shoulder and that this injury has persisted since the time of the accident. We find no manifest error in the trial court's finding of causation.

General Damages
General damages are those which compensate the victim for mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment, or other losses which cannot be measured in exact monetary terms. Marshall, supra; King v. Illinois National Ins. Co., 34,473 (La.App.2d Cir.2/28/01), 782 So.2d 1104, writ denied, 01-1244 (La.6/22/01), 794 So.2d 788, 01-1245 (La.6/22/01), 794 So.2d 788. Much discretion is left to the trier of fact in assessing general damages. La. C.C. art. 2324.1. In fact, this discretion is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); King, supra. It is only when the award is in either direction beyond that which a reasonable trier of fact could assess for the effects of a particular injury to the particular plaintiff under the particular circumstances that the appellate court should decrease or increase the award. Youn, supra. Whether an award is excessive must be determined by viewing the evidence in the light most favorable to the plaintiff. King, supra; Morris v. United Services Auto. Ass'n, 32,528 (La.App.2d Cir.2/18/00), 756 So.2d 549. Only after an articulated factual analysis discloses an abuse of discretion does resort to prior awards for guidance become necessary. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987); Hughes, supra.
Shelter argues that the award of general damages is excessive and that it should be reduced to reflect a non-disabling condition of six to eighteen months' duration. Shelter points out that the *1172 award is based only on Theresa's subjective complaints and argues that the trial court should not have given much weight to her testimony because she was impeached on the issue of days missed from work due to her injury.
While Theresa's testimony regarding absences from work was impeached, the majority of her testimony regarding her injury was corroborated by other witnesses and was considered credible by the trial court. Much of Shelter's argument regarding general damages is based on the issue of causation, which we found to have been properly resolved by the trial court. Thus, an award of damages based on an injury lasting only six to eighteen months is not warranted under this facts of this case.
The testimony established that Theresa began having pain in her neck and shoulder area soon after the accident. The manifestation of pain was witnessed by her co-workers with whom she was traveling to Florida. One such witness was Kathleen Crawley, who testified that Theresa had no symptoms of neck pain prior to the accident and that she had been "happy go lucky and full of fun." According to Crawley, Theresa began having pain after the accident and never seemed free of pain thereafter. Crawley witnessed Theresa in pain at work, sometimes in tears and with dark circles under her eyes due to lack of sleep. Crawley recalled Theresa either placing hot packs on her neck and shoulder at lunch time or going home for a hot bath. She testified that Theresa engaged in less social activity after the accident and that she was heartbroken at being unable to help care for her grandson due to being unable to lift him.
Norma Judy Abbott and Ashley Keever, other co-workers whose depositions were introduced into evidence, gave similar accounts of Theresa's onset of pain following the accident and how the pain impacted her work routine. Vera Fowler, who was working with Theresa at the time of the accident and had done so since 1997, testified that Theresa's condition seems to be worsening. The testimony of the co-workers showed that the work of a surgical assistant is demanding in that they are forced to stand in fixed positions over patients for prolonged periods of time. This work causes discomfort to everyone and necessitates the occasional changing of positions or duties with others assisting the doctor. Nevertheless, Theresa continued working and tried to deal with the pain by the application of hot or cold packs, hot baths, medication, and incorporating additional work duties to alleviate the added discomforts of assisting during surgery.
Theresa testified that she hurts twenty-four hours a day whether she does anything or not. She admitted that she has gone line dancing over the years as exercise, perhaps twice a week at times. She remarried in 1997. She began drinking quite a bit in 1998 as a means of alleviating the pain, but it did not help. Her husband, Jesse Hearold, testified that she hurts every day, with some days being worse than others. He described Theresa as often depressed and having regular crying spells. Although he works away from home much of the time, Jesse does many of the household chores and yard work to help Theresa.
Theresa's complaints of pain are subjective, and there have been no objective findings of injury on x-rays, CT scans, or MRI's done over the years. However, none of Theresa's treating physicians have described her as a malingerer or testified that she is magnifying her symptoms.
Dr. Brown, an orthopaedic surgeon, began treating Theresa in October 1991. He believed she had some postural problems, possibly related to thoracic outlet syndrome, *1173 but he also diagnosed her as having a soft tissue injury of the neck and spine, or chronic cervical strain. He believed that such an injury should resolve itself within six to eighteen months depending on its severity. His treatment of Theresa included orders for physical therapy and medication. He referred her to a psychologist for an evaluation and help with pain management. Dr. Brown discontinued active treatment of Theresa in March 1992, because he did not think she had an orthopaedic condition that warranted his continued care. He believed that a primary care physician could take care of her prescriptive needs. Dr. Brown did see Theresa again in 1999 for an evaluation. His impression at that time was that she was suffering from chronic cervical disc syndrome and that she had not experienced significant deterioration over the past eight years.
In May 1992, Theresa was also evaluated by Dr. Donna Donald, an internal medicine specialist. This evaluation was primarily for depression, but Dr. Donald also conducted a complete physical exam of Theresa. Theresa reported having been involved in the accident at issue and having been through a divorce. She complained of pain in the neck and shoulder area, problems sleeping, and bouts of crying. Dr. Donald found tenderness in the cervical spine area radiating to both shoulders, but primarily on the right side. She described tenderness to touch as an objective symptom of pain. Although Dr. Donald stated there is no way to determine the exact cause of depression, she believed that Theresa's continuing pain was a contributing factor to her depression. Dr. Donald described Theresa's condition as severe musculoskeletal pain with depression. She explained that an injury of that type could resolve itself within a couple of months or last for a protracted period of time. Dr. Donald testified that she had no reason to doubt Theresa's account of the pain she experienced as a result of the injury. Finally, Dr. Donald believed that Theresa was in need of further treatment, but that she seemed to have simply given up.
Dr. Ferral Endsley, a specialist in physical medicine and rehabilitation, began treating Theresa in June 1992, after a referral by the psychologists to whom Dr. Brown had sent her for an evaluation. According to Dr. Endsley, Theresa related her symptoms to the vehicular accident at issue, and he found her complaints to be consistent with the type of wreck that occurred. He diagnosed Theresa's condition as cervical and trapezius muscle strain with chronic pain as a secondary ailment. He also noted that continuing pain would subject Theresa to bouts of depression and anxiety. He noted that her work as a surgical assistant was likely aggravating her condition. Dr. Endsley admitted Theresa to an inpatient pain management program for two weeks during the summer of 1992. The inpatient program resulted in a significant decrease in the pain reported by Theresa. However, she began reporting increased pain within weeks of discharge from the program. Because Theresa had been in pain for over a year and the inpatient program had not succeeded in resolving the problem, Dr. Endsley did not expect her complaints of pain to go away. Rather, he expected the pain to persist, possibly leading to degenerative changes later in life. His records noted the likelihood that Theresa would continue to have problems on a permanent basis. Dr. Endsley believed an appropriate goal for Theresa's treatment would be to get the pain down to a tolerable level. He expressed the opinion that chronic pain sufferers should remain active and engage in some type of exercise program. He noted that Theresa had been consistent in *1174 continuing to work and that engaging in line dancing would be a good form of exercise if not done too often or aggressively. He did not recommend playing pool as a good activity.
Dr. Endsley last saw Theresa in 1999, six years after he had last treated her in 1993. Theresa was still having neck and shoulder pain consistent with her prior symptoms. Dr. Endsley did not believe that Theresa was either malingering or magnifying her symptoms. He noted in his records that her musculoskeletal pain appeared to be worse, that she was having a more difficult time managing the pain, and that the pain was no longer responding to conservative treatment. Dr. Endsley concluded that the pain may last the rest of her life and that she would most likely continue to require medical care.
At the time of trial, Theresa was being treated by Dr. Greg Vigna, a physical medicine and rehabilitation specialist. According to Dr. Vigna, Theresa related her symptoms to the automobile accident of 1991. He explained that persistent pain could result from even a minor whiplash type injury. He found tenderness in the neck area upon palpitation and determined that she was suffering persistent muscular pain. Dr. Vigna first treated Theresa with medications for muscular pain and sleeping. Her symptoms appeared no better on subsequent visits. Because Theresa continued to report consistent symptoms, Dr. Vigna believed that she might benefit from Botox injections in the area of pain. According to Dr. Vigna, the injections are very painful and expensive. Even if the treatment is successful, the effects are temporary, and the patient must undergo repeated injections every three or four months. Dr. Vigna explained that Botox is an "end of the line" remedy for chronic pain sufferers and that he uses it on patients to keep them functioning in their jobs and daily lives. Dr. Vigna believed that Theresa should continue working and dancing. He explained that you want chronic pain sufferers to remain functioning. At the time of Dr. Vigna's deposition, he had only administered the first round of Botox injections at a reduced dosage to Theresa's neck and shoulder area. Theresa testified that she felt some relief and that she would undergo the injections again at a higher dosage.
The evidence establishes that Theresa suffered a soft tissue injury of her neck and shoulder area as a result of the accident at issue. This injury has persisted over the years and will likely continue to cause her pain and discomfort indefinitely. Theresa has also suffered from depression and sleeping problems in connection with the persistent pain. She sought medical treatment soon after the accident and continued under regular medical care until 1993, when it appeared that there was nothing more to be done. The trial court found it plausible that she gave up on treatment for a time and tried to incorporate the pain into her life. We agree. She has remained on various pain medications over the years, and she has continued doing what she can to alleviate the pain, such as taking hot baths and using hot or cold packs. Her testimony describing her pain and its effects on her life was corroborated by lay witnesses and physicians. The trial court found the witnesses' testimony to be credible. In awarding general damages in the amount of $150,000, the trial court considered the severity and long-term nature of Theresa's symptoms, the psychological effects and inconveniences of the injury, and the probability of the injury never completely resolving itself. Viewing the evidence in the light most favorable to the plaintiff and considering the particular effects of this injury on Theresa, we cannot say that the trial court abused its *1175 discretion. Accordingly, we affirm the award of general damages.

Special Damages
The trial court awarded Theresa special damages for past medical expenses, future medical expenses, and future loss of income. Shelter appeals these awards. It argues that Theresa should not have been awarded medical expenses for treatment rendered after 1992 and that the awards for future medical expenses and future loss of income are not supported by the record. Theresa appeals the awards of future medical expenses and future loss of wages, which she contends are inadequate. She also argues that the trial court erred in failing to award her damages for past loss of income.
To recover medical expenses, the plaintiff must prove that, more probably than not, the medical treatment was necessitated by the accident. Brandao v. Wal-Mart Stores, Inc., 35,368 (La.App.2d Cir.12/19/01), 803 So.2d 1039, writ denied, 02-0493 (La.4/26/02), 814 So.2d 558. The trial court awarded past medical expenses of $22,747. Theresa asserts no error with regard to this award. Having determined that the trial court properly resolved the issue of causation, we find no merit in Shelter's contention that the trial court erred in awarding medical expenses for treatment incurred by Theresa after 1992. Accordingly, the award of past medical expenses is affirmed.
The trial court awarded $30,000 for future medical expenses. Both parties appeal this award. Future medical expenses are by their nature insusceptible of precise measurement. As such, much discretion is left to the trier of fact in making a reasonable assessment of such damages. Dugas v. Derouen, 01-1397 (La. App. 3d Cir.7/3/02), 824 So.2d 475. The burden is on the plaintiff to show more probably than not that these expenses will be incurred. Brandao, supra. When the record establishes that future medical expenses will be necessary and inevitable, such an award should not be rejected on the basis that the record does not provide the exact value of the such expenses, if the court can determine from the evidence a minimum amount that reasonable minds could agree would be required. Stiles v. K-Mart Corporation, 597 So.2d 1012 (La. 1992).
Dr. Endsley and Dr. Vigna both testified that Theresa's condition would likely continue indefinitely. Dr. Vigna believed that Botox might provide some relief for Theresa, and her testimony after the initial injections was that there had been some success. However, Dr. Brown, in an affidavit admitted into evidence, disputed the efficacy of Botox for Theresa's condition. He stated that there is no widespread support for the use of Botox on patients with purely subjective complaints of soft tissue pain. Nevertheless, the record does establish the likelihood of Theresa requiring ongoing medical attention for the persistent pain from the soft tissue injury. Treatment may include Botox for some time if it is found to be effective, or it may simply include the continuing need for prescriptive medications. Theresa's injury had not resolved itself within ten years of the accident, and there were indications that Theresa's condition seemed to be worsening and not responding to conservative treatment. Having reviewed the record, we do not find an abuse of discretion by the trial court in awarding $30,000 for future medical expenses, nor can we say that the record establishes the need for a greater award. As such, we affirm the award for future medical expenses.
The trial court rejected Theresa's claim for past lost wages. The plaintiff bears the burden of proving a claim for *1176 loss of wages with reasonable certainty. Dugas, supra. Theresa testified repeatedly that all of the time she took off from work since the accident was attributable to her injury from the accident. However, the trial court found that the bulk of time she missed since the accident was for personal reasons unrelated to the accident. This finding is supported by the record. While Theresa claims she should be compensated for days missed in 2000, the record shows that she no longer worked Wednesday afternoons and Fridays because Dr. Rhymes did not work those days and not because of any necessity due to pain. We do not find that Theresa met the burden of proving her claim for lost wages by a reasonable certainty.
After denying the claim for past loss of wages, the trial court awarded Theresa $20,000 for future loss of wages. Shelter asserts that this award is unwarranted. Theresa seeks an increase in the amount awarded. Awards for loss of future income are inherently speculative and insusceptible of calculation with mathematical certainty. Moody v. Blanchard Place Apartments, 34,587 (La.App.2d Cir.6/20/01), 793 So.2d 281, writ denied, 01-2582 (La.12/14/01), 804 So.2d 647. Factors to be considered in awarding damages for future loss of income include the plaintiff's physical condition before and after his injury, the plaintiff's work history and consistency thereof, the amount the plaintiff would have earned had the injury not occurred, and the probability of the plaintiff continuing to earn wages over his working life. Moody, supra; Dugas, supra.
While greater deference may be afforded the trial court in assessing damages for future loss of wages, we must conclude that the trial court abused its discretion in awarding such damages in this instance. In its reasons for judgment, the trial court concluded that "plain reason" indicated that Theresa's "work activity may be curtailed" if she continues to suffer from her injury. However, there was nothing in the record to indicate that Theresa would no longer be able to work due to the pain from the injury. In fact, Theresa has been able to maintain a normal work schedule since the injury. Her income has increased over the years. She has had no restrictions imposed on her by healthcare providers. None of the physicians who treated her testified that she would be unable to continue working. In fact, Dr. Vigna was willing to try the Botox injections precisely because Theresa had continued to work and function in society despite being in pain. The record simply contains no evidence upon which to base an award for loss of future wages. While we recognize that an award for future loss of wages is highly speculative, mere conjecture by the trial court regarding the plaintiff's possible future situation is not sufficient to support such an award. Accordingly, we strike that portion of the judgment awarding damages for future loss of wages.

CONCLUSION
For the reasons mentioned, we affirm those portions of the trial court's judgment awarding the plaintiff general damages, past medical expenses, and future medical expenses. However, the judgment is amended to strike the award of damages for future loss of wages. Costs of this appeal are assessed to Shelter.
AMENDED IN PART, AND AFFIRMED AS AMENDED.
NOTES
[1] The plaintiff was remarried and referred to as Theresa Hearold at the time of trial.
[2] Kent Breard, Sr., died before trial of this matter. He was dismissed from the suit. Accordingly, Shelter was the sole defendant at trial.