hDREW, J.
In this suit to recover damages for medical malpractice, Dr. Carter Boyd appeals a judgment awarding plaintiffs a total of $36,150 in general and special damages sustained as the result of Dr. Boyd’s failure to timely order a blood test which would have detected Debra Costa’s declining renal function and ultimately, her chronic renal failure.
We amend the judgment to reduce the award of special damages, and as amended, the judgment is affirmed.

FACTS

Dr. Boyd, a family medicine practitioner, first began treating Mrs. Costa on a regular basis on June 15, 1993.[1] On that date, he took Mrs. Costa’s history and performed a physical examination. Mrs. Cos-ta told Dr. Boyd that she suffered from hypertension and was taking Lopressor, a medication used to treat hypertension. Based upon the examination and history given, Dr. Boyd diagnosed hypertension and prescribed 100 mg of Lopressor, which was the same dosage prescribed by her previous physician. Dr. Boyd did not order any lab work at this time. A booklet regarding the complications of hypertension was provided to Mrs. Costa during this visit.
The record reveals that over the next 15 months, Mrs. Costa had the following contact with Dr. Boyd or his office personnel:
1?• July 27, 1993: Dr. Boyd treated Mrs. Costa for her complaints of headaches, stomach cramps and knee pain from a fall. His diagnosis was acute gastritis. Her blood pressure continued to be elevated.
• November 10, 1993: A prescription for Ru-Tuss medication was called in for Mrs. Costa.
• November 15, 1993: Mrs. Costa went to Dr. Boyd’s office with complaints of congestion in the lungs, coughing, a pain between her shoulders and an odd reaction from Ru-Tuss and Sel-dane medicines. Dr. Boyd diagnosed pleurisy, for which he prescribed a cough syrup and antibiotics. Mrs. Costa also received two injections containing an antibiotic and medication to treat her congestion.
• November 22, 1993: A prescription for Lopressor was called in for Mrs. Cos-ta.
• December 9,1993: Dr. Boyd examined Mrs. Costa. Mrs. Costa remained hypertensive, so Dr. Boyd prescribed Procardia, a blood pressure medication compatible with Lopressor. A neuro-vascular exam, which included a fundo-scopic examination of the eyes, was normal. Her blood pressure was taken by a nurse the next day.
*1268 • December 23, 1993: A prescription for an antibiotic was called in for Mrs. Costa. Her blood pressure was checked by a nurse four days later, when Mrs. Costa was given samples and a prescription for Procardia. Her blood pressure was beginning to show improvement.
• January 11, 1994: A prescription for Procardia was called in for Mrs. Costa.
1February 7, 1994: Mrs. Costa was examined by Dr. Boyd. A pregnancy test was done during this visit because Mrs. Costa’s medicines would have to be changed if she had been pregnant. The pregnancy test was negative.
• April 21, 1994, and August 10, 1994: Prescriptions for Lopressor were called in for Mrs. Costa.
• September 29, 1994: Mrs. Costa’s blood pressure was checked by Dr. Costa’s nurse.
Medication to treat congestion was called in for Mrs. Boyd on October 27, 1994. Mrs. Costa was examined by Dr. Boyd for the first time in nearly nine months on November 3, 1994. She complained at the time of coughing, nausea, vomiting and shakiness. Her face was swollen and her eyes were “matting.” Dr. Boyd’s impression was an upper respiratory infection, so he prescribed the antihistamine Seldane, the antibiotic Keflex, and eye drops, and gave her an injection of antibiotics and an injection of medicine to treat the congestion. A fundoseopic examination of her eyes did not reveal any deterioration of the blood vessels in her eyes.
Mrs. Costa was treated by Dr. Roy Fleniken on November 4, 1994. Dr. Flen-iken’s diagnosis was sinusitis ethmoid, for which he gave her Claritin and Yantin. Mrs. Costa testified that Dr. Boyd felt she had a sinus infection and he wanted to send her to a specialist. Dr. Boyd could not recall referring Mrs. Costa to Dr. Fleniken. Mrs. Costa apparently chose Dr. Fleniken because he treated her husband.
|4Pr. Boyd increased Mrs. Costa’s Pro-cardia dosage on November 8, 1994. Prescriptions for Lopressor and a medication for dizziness were also called in on this date. A prescription for Xanax was called in three days later. Mrs. Costa stated that she had told Dr. Boyd that she was shaking from being weak, felt fatigued and was unable to keep food down. A prescription for Vistaril, used to treat nausea and vomiting, was called in on November 18.
Dr. Boyd examined Mrs. Costa again on November 21, 1994. Mrs. Costa continued to complain of nausea and vomiting. A physical examination showed that her cardiovascular system was clear, her chest was clear, her abdomen was soft and her vital signs were positive. Mrs. Costa had lost 10 pounds since her prior visit. For the first time, Dr. Boyd ordered a lab work-up on Mrs. Costa. He explained that he did this because he could not determine what was causing her continued symptoms.
The lab tests showed that Mrs. Costa was in renal failure. The BUN (Blood Urea Nitrogen) test is an assessment of kidney function. The normal BUN range is between 7 and 25. Mrs. Costa’s BUN measured 207. A creatinine test is also used to measure kidney function. Normal range on a creatinine test is 0.7 to 1.4. Mrs. Costa’s creatinine level was 26.6.
Mrs. Costa met with Dr. Boyd at his office the next day. She continued to complain of nausea, and she stated that her vision was bright. Dr. Boyd reviewed Mrs. Costa’s lab results with her and told her that she needed to go to the hospital. He suggested Bossier Medical Center, but when she reminded him that she did not have insurance, he told her to go to | BLSU Medical Center (“LSUMC”). This was the *1269 last time that Dr. Boyd treated Mrs. Cos-ta.
When Mrs. Costa was examined at LSUMC on November 22, 1994, it was discovered through a renal ultrasound that her Mdneys had shrunken to one-half of their normal size, which was consistent with chronic renal failure. Damage to the retinal vessels in her eyes, consistent with hypertensive retinopathy, was also discovered.
Upon her admission to LSUMC, she received stat hemodialysis through a venous catheter in her groin. Her creatinine was reduced to 18.4. A catheter was placed in a right neck vein for hemodialy-sis on November 28, 1994. Mrs. Costa was discharged from LSUMC on November 30, 1994. A Tenckhoff catheter, used for peritoneal dialysis, was surgically placed in Mrs. Costa on December 9, 1994. Mrs. Costa preferred peritoneal dialysis, but occasionally she would have to rely on hemodialysis due to recurring problems with the Tenckhoff catheter and staph infections. Mrs. Costa remained on dialysis in either form for the remainder of her life. Mrs. Costa died on April 1, 1999, at the age of 42 of a heart attack.

PROCEDURAL HISTORY

A petition to impanel a Medical Review Panel filed by Mrs. Costa and her husband, Michael Costa, was received by the Patients’ Compensation Fund on August 10, 1995. It was alleged by the Costas that Mrs. Costa had suffered acute renal failure due to Dr. Boyd’s medical malpractice. The Medical Review Panel rendered an opinion on October 8, 1997, concluding that Dr. Boyd failed to meet the applicable standard of |ficare. However, the panel also concluded that Dr. Boyd’s conduct was not a factor in the “alleged resultant damages.” The panel stated in its written reasons for its opinion:
A delay in diagnosis does not breach the standard of care in every case. However, it is our conclusion that the standard of care was not met solely for the following reason:
All hypertensive patients should receive baseline renal function and periodic laboratory follow-up examination. Dr. Boyd failed to obtain baseline or follow-up laboratory studies in a hypertensive patient on medication.
The conduct complained of was not a factor in the alleged resultant damages for the following reasons:
1. We find that this is a case of chronic renal failure and not acute renal failure.
2. Dr. Boyd’s treatment of her hypertension is appropriate and, as recorded in the record from LSUMC Nephrologists, has been continued in exactly the same dosage.
3. Although the diagnosis of chronic renal failure was delayed, it is not a contributing factor. in the eventual outcome of this case.
Deborah and Michael Costa filed suit on November 10, 1997, against Dr. Boyd and his place of employment, the Family Practice Clinic in Bossier City. In their answer, defendants pled Debra Costa’s own fault in failing to comply with treatment and, in the alternative, the fault of third parties. Mrs. Costa’s surviving spouse, Michael Costa, was substituted as party plaintiff upon Mrs. Costa’s death on April 1, 1999.
Trial was held in this matter on August 31, 2001. Numerous depositions, including that of Mrs. Costa, and medical records were admitted into evidence. The trial court issued written reasons for judgment on April 11, 2002. The trial court agreed with the Medical Review Panel pthat Dr. Boyd failed the meet the standard of care. The trial court concluded that the evidence established, more likely than not, *1270 that: (1) if Dr. Boyd had performed the lab tests sooner, then he would have been in a better position to treat Mrs. Costa and she would not have suffered the abrupt critical situation that she experienced from early November through the date of her release from LSUMC; (2) although Mrs. Costa would have suffered renal failure regardless of when she was tested and her condition would have worsened, her condition would not have worsened in the manner and time frame that it did; (3) Mrs. Costa suffered significantly more than she would have suffered had her condition been properly diagnosed earlier; and (4) although Mrs. Costa may have ultimately needed dialysis treatment, it would not have been in the manner and way in which she received it on or about November 22, 1994. The court awarded $30,000 in general damages and $6,150 in special damages representing the medical expenses incurred from November 22 through November 30, 1994. A claim for loss of consortium was denied. Judgment in accordance with the reasons for judgment was rendered on April 25, 2002. Dr. Boyd and the Family Practice Clinic appeal the judgment.

DISCUSSION

In order to recover against Dr. Boyd and the Family Practice Clinic, plaintiffs were required to establish, pursuant to La. R.S. 9:2794:
1.The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues |speculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
2. That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
3. That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
A court of appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).

Breach of Standard of Care

Dr. Boyd and the Family Practice Clinic argue in their first assignment of error that the trial court was clearly wrong in finding that Dr. Boyd breached the applicable standard of care. As noted above, the Medical Review Panel declared that Dr. Boyd did not meet the standard of care when he failed to obtain baseline renal function and periodic follow-up lab studies, which should be received by all hypertensive patients.
Dr. Russell Roberts, who was on the Medical Review Panel, testified as an expert in family medicine. He stated that at some point during the course of diagnosis and treatment, Dr. Boyd should have ordered a baseline lab study. Dr. George Risinger, a family medicine practitioner, was also a | amember of the Medical Review Panel. Dr. Risinger agreed that it is im *1271 portant to get a baseline study and periodic lab work when treating a hypertensive patient in order to monitor changes in renal function, which permits the physician to determine if the treatment is preserving renal function. Dr. Risinger considered Dr. Boyd’s failure to order these lab tests to be a breach of the standard of care as Dr. Boyd was left unaware of the status of Mrs. Costa’s failing kidneys.
Appellants point to what occurred during the June 15, 1993, office visit as justification for why Dr. Boyd did not order baseline or periodic lab work to monitor the effects of Mrs. Costa’s hypertension. There is a notation from Dr. Boyd’s nurse on Mrs. Costa’s chart for that visit that reads, “Speak with you only.” Dr. Boyd recalled that when they were alone, Mrs. Costa told him that because she wanted expenses kept to a minimum, “she did not want a lot of tests done” and wanted medication samples. He believed her focus was more on economics than on her hypertension.
Dr. Boyd agreed that the standard of care with hypertension patients is to do a baseline lab profile. He also admitted that with a new patient who is hypertensive, he would normally order baseline lab work. However, Dr. Boyd stated that he did not do so in Mrs. Costa’s case because he believed that she did not want him to order it due to her financial situation.
Dr. Boyd remarked that his discussion with Mrs. Costa on June 15, 1993, and what he understood she wanted done changed the way he normally would have treated her, and he felt that she was aware of the potential consequences. He also alleged that he mentioned getting the lab |instudies done at LSUMC to Mrs. Costa. When questioned about the findings of the Medical Review Panel on the standard of care, Dr. Boyd stated that due to Mrs. Costa’ financial concerns, he disagreed with the conclusion because he felt some treatment was better than no treatment and he tried to control her blood pressure.
Dr. Roberts testified that Dr. Boyd should have documented Mrs. Costa’s financial concerns somewhere in the chart. The phrase “speak only” could have meant to Dr. Roberts that Mrs. Costa did not want a normal appointment and evaluation. Dr. Roberts opined that assuming Mrs. Costa told Dr. Boyd that she didn’t want the test, then he felt Dr. Boyd met the standard of care.
Mrs. Costa denied telling Dr. Boyd that she was having financial problems and could not afford her medication and office visits. In 1994, Mr. Costa had health insurance through his employer but his wife was not covered under this plan. Our review of the medical bills shows that Mrs. Costa paid for the services rendered by Dr. Boyd at least through November of 1994. We particularly note that the total cost of the blood tests (SMA Panel 14, CBC and SED Rate) amounted to a relatively inexpensive $80.
Dr. Boyd testified that the lab work was done in November 1994 at his suggestion, in spite of Mrs. Costa’s earlier financial concerns, because he felt he needed to determine what was causing her continued symptoms. This was contradicted by Mrs. Costa’s testimony that when Dr. Boyd suggested on November 21, 1994, that he give her additional injections and h Jet her wait a week to see if her condition improved, she asked him if he could do a blood test because she had been sick for so long.
It does not appear from the record whether or not Mrs. Costa’s financial situation improved between June 1993 and November 1994. Thus, it can be presumed that she still had the same concerns about the costs of lab work on the latter date. Yet, despite the financial considerations, Dr. Boyd now felt the test was *1272 important enough to override financial concerns.
If Dr. Boyd believed that Mrs. Costa could only afford incomplete treatment, then he should have refused treatment when she first voiced concerns about spending money on lab work. Mrs. Costa did not present him with an emergency situation in June of 1993, so he should have referred her to LSUMC for complete treatment of her hypertension at that time, regardless of any complaints that she may have had about waiting in line at LSUMC.
This assignment of error is without merit. Dr. Boyd clearly breached the applicable standard of care.

Causation

Appellants next contend that the trial court erred in finding that Dr. Boyd’s conduct caused damages to Mrs. Costa. We note that it is not alleged by plaintiffs that Dr. Boyd was responsible for Mrs. Costa’s end stage renal disease. Rather, it is alleged that had Dr. Boyd diagnosed Mrs. Costa’s progressive renal insufficiency or renal failure earlier, then she would have been able to start dialysis sooner and would not have | ^experienced the pain and suffering that she primarily endured in November of 1994.
The Medical Review Panel determined that Dr. Boyd’s conduct was not a factor in the “alleged resultant damages.” However, it is apparent the Medical Review Panel was referring to the chronic renal failure when it mentioned “resultant damages.” Dr. Risinger and Dr. Roberts each testified that the phrase “alleged resultant damages” in the panel’s opinion was a reference to the renal failure.
Expert testimony clarified why the delay in diagnosis did not cause the renal failure. Dr. Roberts concluded that the renal disease was progressive and the renal failure was inevitable. Controlling the blood pressure would have only prevented the damage from occurring as quickly. Dr. Roberts believed that although dialysis probably would have started sooner if the lab tests had been ordered- earlier, the delay in diagnosis did not affect the outcome of the kidneys. He conceded that in chronic renal failure due to hypertension, what renal function that is preserved depends on how well the blood pressure is controlled. Both Dr. Roberts and Dr. Ri-singer thought Dr. Boyd treated the hypertension appropriately, and both noted that her high blood-pressure medications, and their respective dosages, remained the same after her discharge from LSUMC as had been earlier prescribed by Dr. Boyd.
Dr. Roberts testified that for most individuals, dialysis will be considered once the creatinine level climbs to about four or five. He stated that for a patient Mrs. Costa’s age, the purpose of dialysis is to keep the Impatient alive until they can receive a kidney transplant. He agreed that dialysis for chronic renal failure could preserve renal function, but he added that there would not be enough kidney function left to be effective or otherwise the patient would not have needed dialysis in the first place. Thus, in patients with irreversible end-stage kidney disease, the renal function left when the patient enters dialysis is generally inconsequential. Dr. Roberts also explained that once a patient is placed on dialysis, he is probably going to receive a similar course of dialysis regardless of what kidney function he has remaining.
Dr. Risinger stated that Mrs. Costa’s end-stage renal failure due to hypertension would have happened regardless of when it was detected. He also stated that even though there was a delay in diagnosing the renal failure, the delay in commencing dialysis did not make a difference because the ultimate outcome was the same.
Dr. Risinger declared that all that can be done for declining renal function due to hypertension is to lower the blood pres *1273 sure in order to prevent further damage to the kidneys. Dr. Risinger added that once the kidneys begin to fail due to long-standing high blood pressure, the only courses of treatment are dialysis and transplant. Dr. Risinger could not answer whether there was ever a time in which Mrs. Cos-ta’s kidney disease was reversible.
The trial court granted recovery to Mrs. Costa for the pain and suffering she experienced in November of 1994, which the court considered to be “extremely severe.” The court concluded that this pain and suffering |ucould have been alleviated or greatly minimized had Mrs. Costa’s declining renal function been diagnosed in a more timely manner.
Appellants contend that plaintiffs cannot prevail because there was no expert testimony presented establishing that Mrs. Costa would have suffered less had she commenced dialysis earlier. However, this contention is not supported by Dr. Rising-er’s testimony:
Q: And isn’t it a fact that had you sought an opinion, or this doctor sought an opinion, had he known of her end stage renal failure and her increase in BUN and creatinine, that more probably than not she would not have had the condition as she got on November 22nd, '94?
A: She would have not had the level of the BUN and creatinine.
Dr. Roberts testified that some signs of renal failure include nausea, vomiting, fatigue and general malaise. Mrs. Costa reported having these symptoms. Dr. Roberts stated that in a chronic renal failure case, if the patient was otherwise functioning well, the increase in creatinine was probably slow and tolerated by the patient. He noted that Mrs. Costa was still able to function even with her elevated BUN and creatinine levels. He also noted that without detection and dialysis, Mrs. Costa would have become progressively sicker. Dr. Risinger testified that there are no symptoms of renal failure until it gets very far along, but the patient generally doesn’t feel well.
Mr. Costa recalled that in October of 1994, his wife was complaining of backaches, problems with her eyes, vomiting and her nerves. He stated that in early November, Mrs. Costa was unable to keep her food down. Mrs. Costa was examined by Dr. Boyd on November 3, 1994, when she |1Bcomplained of coughing, nausea, vomiting and shakiness. On that date, her face was swollen and her eyes were “matting.” Mrs. Costa remembered also being fatigued and having diarrhea. Dr. Boyd thought her symptoms were caused by an upper respiratory infection. Mrs. Costa recalled Dr. Boyd telling her that she had the flu. Over approximately the next two weeks, Dr. Boyd prescribed medications for dizziness, anxiety, nausea and vomiting.
Mrs. Costa was next examined by Dr. Boyd on November 21, 1994. Mrs. Costa was very fearful because she felt weak and as if she was dying. She testified that Dr. Boyd still thought she had the flu and wanted to wait another week to see what happened. She also testified that she requested a blood test because she had been sick for so long. Mrs. Costa stated that she continued vomiting that night.
Mrs. Costa testified that she felt even worse the next day, November 22. Her hands, feet and face were swollen; her vision was blurred; and she felt like her bones were aching. When she called Dr. Boyd’s office to inquire about the test results, she was told to come to the office and that afterwards she would need to go to the hospital. “When her mother, Eleanor McConaha, arrived to drive her to Dr. Boyd’s office, Mrs. Costa was sitting on her bed, unable to move or dress herself. Her sister-in-law, Carol Harris, recalled *1274 finding Mrs. Costa weak and unable to walk.
Mrs. Costa testified that when Dr. Boyd showed her the lab results, he told her that she was a “walking dead woman.” Mrs. McConaha and Mrs. Harris corroborated this, although Dr. Boyd did not recall making this statement. He testified that he would have said that Mrs. Costa was very 11fisick. Dr. Boyd did not consider Mrs. Costa to be so critical on this date that she needed to be transported by ambulance. Her vital signs were stable and she had a normal blood pressure, respiratory rate and pulse. In any event, she needed to be hospitalized and receive dialysis for her kidneys.
Appellants further argue that any suffering Mrs. Costa experienced due to the delayed diagnosis was offset by the suffering she would have experienced had she commenced dialysis earlier.
According to Dr. Roberts, dialysis is a difficult treatment for the patient, with some patients putting it off for as long as possible. While Dr. Roberts felt that dialysis would make a person having many of the signs of renal failure feel a little bit better, it would be a “wash out” as to how they would feel. He added that most people don’t see much improvement because they start it before they begin feeling ill. Dr. Risinger agreed that doctors do not like to place patients on dialysis unless they have to, and they try to delay it as much as possible if they can keep the patient’s condition under control.
Hemodialysis is done directly through a blood vessel, and it involves filtration of the blood. Peritoneal dialysis is done through the abdominal wall, and involves filtration through the peritoneal cavity. Dr. Roberts thought most patients preferred peritoneal dialysis because it allowed more freedom, could be done at home and was less of a shock to the system.
When Mrs. Costa was admitted to LSUMC in November 1994, she underwent hemodialysis at first through a catheter in a vein in her groin and then through a catheter in a neck vein. A Tenckhoff catheter to be used for |17peritoneal dialysis was surgically placed in her abdomen on December 9, 1994. The Tenckhoff catheter was surgically redirected on December 22, 1994, because it was not functioning. Her hemodialysis was moved to the Shreveport Dialysis Clinic that month.
Mrs. Costa began peritoneal dialysis in early 1995. In April of 1995, Mrs. Costa was hospitalized overnight with staph peritonitis due to the peritoneal dialysis. That July, she suffered a staph infection at the Tenckhoff catheter exit site and was hospitalized. Another staph infection was diagnosed in October. The Tenckhoff catheter was surgically removed at LSUMC on December 7, 1995, due to recurrent peritonitis, and a catheter for temporary hemodial-ysis was placed in a vein in her neck on December 11, 1995. On December 29, 1995, a Permacath catheter was placed in a vein in the right side of her neck. The Permacath catheter was replaced on January 22, 1996, because it was not functioning.
A Tenckhoff catheter was surgically placed in Mrs. Costa’s abdomen on February 1, 1996. A lab report from February 6, 1996, showed a light growth of staphylococcus at the exit site. The Tenckhoff catheter was redirected on February 23, 1996, because it was not functioning properly and the flow needed to be reestablished. Peritoneal dialysis was resumed in March of 1996. The Permacath catheter in the neck vein used for hemodialysis was removed on March 8, 1996. In July of 1996, Mrs. Costa was diagnosed with peritonitis and was again hospitalized. In September of 1997, there was a light growth of staph aureus in her peritoneal *1275 fluid. Mrs. Costa apparently remained on peritoneal dialysis until her death.
11RMrs. Costa preferred peritoneal dialysis because she could do it at home while in bed, which made it more convenient, and she felt that it left her with more energy. She was on the peritoneal dialysis machine each night for approximately eight hours and 45 minutes, and during this time she kept a bathroom chair in her bedroom. Mrs. Costa testified that the dialysis was not something that she would want anyone to experience. She stated during her April 1996 deposition that she felt improvement since returning to peritoneal dialysis a month earlier.
Dialysis was clearly not a pleasant experience for Mrs. Costa. However, the record is clear that Mrs. Costa endured pain and suffering in November of 1994 due to the elevated BUN and creatinine levels. It is gross speculation to suggest that if Mrs. Costa had started dialysis earlier, then the aforementioned pain and suffering would have been simply replaced by the discomfort of dialysis that Mrs. Costa may have experienced with earlier dialysis. The trial court was not clearly wrong in assessing damages against Dr. Boyd in this matter. This assignment of error is also without merit.

Award of Medical Expenses

Appellants argue in their penultimate assignment of error that the trial court erred in awarding $6,150 in medical expenses incurred by Mrs. Costa at LSUMC in November of 1994. They assert that Mrs. Costa would have had these expenses regardless of when she began dialysis.
Dr. Boyd testified that a patient needs to be hospitalized initially for hemodialysis in order for vascular access to be obtained and for the 11 filtration to be monitored. A catheter is inserted into an artery to obtain the access, which is usually done by a vascular surgeon.
Dr. Roberts testified that a patient is usually admitted to a hospital for the first few dialysis treatments and to obtain catheter access. He testified that for hemo-dialysis, a surgeon generally puts in permanent access while a nephrologist would generally put in only temporary access. Dr. Roberts stated that a hospital setting was the only place to safely gain vascular access for hemodialysis.
A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of an injury. Whitthorne v. Food Lion, Inc., 30,105 (La.App.2d Cir.1/21/98), 706 So.2d 193. Regarding the standard of review for special damages, this court has stated:
The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Some special damages, such as medical and related expenses, cost to repair or replace damaged property, loss of wages, etc., are easily measured. A plaintiff pleading a special damage must produce some evidence by which that loss can be reasonably measured. Proof of a potential special damage or loss does not meet a plaintiffs burden of proof.
Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992). See also, White v. Wal-Mart Stores, Inc., 32,621 (La.App.2d Cir.3/3/00), 753 So.2d 995, writ denied, 00-1222 (La.6/23/00), 765 So.2d 1041; Moody v. Blanchard Place Apartments, 34,587 (La.App.2d Cir.6/20/01), 793 So.2d 281, writ denied, 01-2582 (La.12/14/01), 804 So.2d 647.
|anWe note from the outset that the total amount of all the medical expenses reflected in Plaintiffs Exhibit (“P-5”) is $6,150, the amount awarded by the trial court. This total amount includes expenses incurred from April 11, 1995, *1276 through July 14, 1995. The trial court clearly stated that the medical bills incurred from November 22 through November 30, 1994, were recoverable special damages. P-5 shows that medical expenses of only $4,610 were actually incurred during this period.
The uncontradicted testimony cited above was that Mrs. Costa would likely have been admitted to the hospital to begin dialysis regardless of when she was diagnosed with renal failure. Nevertheless, the record supports the finding that Mrs. Costa incurred additional expenses when she was admitted on November 22, 1994, due to her condition at that time. Mrs. Costa’s November 30,1994, discharge summary reads that she received “stat” hemodialysis on the date of admission.[2]
It is clear that Mrs. Costa’s elevated creatinine and BUN levels caused her to incur medical expenses from medical treatment that more probably than not she would not have received had she commenced dialysis at an earlier time. Based upon our review of the record, we conclude that the following expenses from November 22, 1994, were incurred due to Dr. Boyd’s malpractice:
• $65 for X-rays of the chest and abdomen;
• $155 for renal scan ultrasound;
|21* $220 for EMS;
• $65 for an arterial puncture;
• $25 for an EKG rhythm;
• $275 for a complete echo;
• $165 for Doppler echocardiogram;
• $150 for Doppler color flow velocity; and
• $545 for acute hemodialysis catherization.[3]
These total $1,665. The awarding of any additional medical expenses incurred at LSUMC in November of 1994 was an abuse of the trial court’s discretion as they were not incurred due to Dr. Boyd’s conduct. Therefore, we amend the award of special damages to reduce it to $1,665, and as amended, the award of special damages is affirmed.

Allocation of fault

Appellants contend in their final assignment of error that the trial court erred in not reducing Dr. Boyd’s fault due to the noncompliance of Mrs. Costa and the negligence of Dr. John Leopard, the first physician to treat her hypertension.
La. C.C. art. 2323 sets out Louisiana’s comparative fault scheme. Petre v. State ex rel. Dept. of Transp. and Development, 01-0876 (La.4/3/02), 817 So.2d 1107. In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the supreme court provided guidelines for determining degrees of fault:
12?Iu determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the *1277 conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id., 469 So.2d at 974.
A trial court’s findings regarding percentages of fault are factual and will not be disturbed on appeal unless clearly wrong. Socorro v. City of New Orleans, 679 So.2d 931 (La.1991); Baughman v. State, Dept. of Transp. and Development, 28,369 (La.App.2d Cir.5/8/96), 674 So.2d 1063, writ denied, 96-1882 (La.11/1/96), 681 So.2d 1260.
Dr. John Leopard, who specialized in family practice, first treated Mrs. Costa on February 7, 1992, for complaints of headaches, nausea and diarrhea. Diagnosing hypertension, he prescribed 100 mg of Lopressor daily. Dr. Leopard prescribed the diuretic Lasix on April 16, 1992, because Mrs. Costa’s blood pressure remained elevated. He treated Mrs. Costa for an upper respiratory infection in June of 1992. On October 5, 1992, he prescribed Corgard, an anti-hypertension medication, to supplement the Lopressor. Dr. Leopard may have discontinued the Lopressor on Mrs. Costa’s next visit, December 2, 1992, although a refill of Lopres-sor was ^called in for her on December 9, 1993. Dr. Leopard was not aware that Dr. Boyd was treating Mrs. Costa at that time. Dr. Leopard last saw Mrs. Costa in December of 1992. He did not feel that her blood pressure was controlled when he was treating her.
Dr. Leopard did not order any baseline lab work on Mrs. Costa during the time he treated her. He stated that in 1992, the younger a hypertension patient was, the less likely he was to order lab work, although he felt he was remiss in not ordering lab work in Mrs. Costa’s case.
Appellants point to excerpts from Dr. Leopard’s deposition testimony where he seemingly admitted to breaching the standard of care. At first, during examination by plaintiffs counsel, Dr. Leopard agreed that the standard of care for a family practitioner in 1992 was to order lab work and get a baseline study for hypertension patients and to do periodic testing. However, later during examination by defendant’s counsel, Dr. Leopard stated that while such studies were “good medicine,” they would not have been required at the time, even though he felt that he fell below the standard of care. We refer to Dr. Leopard’s testimony on this point:
Q: You stated that based on your understanding, in '92 the standard of care required baseline lab for a hypertensive patient. Is that what your testimony is?
A: If that’s the way it came out, I don’t think that’s exactly what I said. I think that would be considered a good standard of care. Whether or not it was, quote, unquote, a “standard of care,” I don’t know.
Q: Okay. I’m trying to — Mr. Miller asked you the question two or three different times, and I was not quite sure of your answer. But do you feel — is it your opinion that back in '92 the standard of care for family practice | ^required or mandated baseline lab studies with all hypertensive patients?
A: I am not aware that it mandates or requires that. I think that would very much be a good standard of care, but whether or not it was mandated or required, I don’t have any idea.
*1278 [[Image here]]
Q: Back in '92, do you feel that the standard of care was and required baseline lab for a lady like this who was hypertensive?
A: Required, no.
[[Image here]]
Required, no. Good medicine, yes. <1
Okay. Do you feel that you fell below the standard of care yourself in not— <3?
By my own definition, yes. i>
You do? >0
Yes. t>
Do you feel that you fell below the standard of care by not ordering baseline lab on her? <0
A: Or getting any lab work on the lady in the entire time I treated her.
G: Okay. So your testimony is you feel that you fell below the standard by not doing that? And I’m not trying to—
A: If this other doctor did, yes, sir, I did. Now, again, if we’re speaking of requirement, neither of us did. Good medicine, yes. If he didn’t order it, as I didn’t order it, then we did.
Dr. Leopard added to the confusion by stating that he was referring to the standard of care in 1998 when questioned about his earlier testimony that he did not follow the standard of care in failing to get a baseline study. |{,K We believe that what Dr. Leopard meant was that his own conduct did not fall below what the law required in terms of a standard of care, but the standard of care by his own definition, which really meant what he felt was “good medicine.” We again turn to his testimony on this point:
Q: And I need to know why you wouldn’t do it, because if you’re on the stand in this case and' I’m ques-tiomng you in front of a jury, I need to know what your response is going to be.
A: I think the standard of care in all aspects of medicine has improved these last six years. I don’t think we held doctors as closely as we do now as relates to studies done on the patients for any particular disease. Now, that’s not to say it’s okay. I said I thought I was remiss by not ordering those studies. That wasn’t as good of medicine as I would like to practice, but I don’t think it was outside the realm of the standard of care. I hope that answers your question.
Q: It does. So I think what you’re telling me is that it’s going to be your testimony that when you treated this lady beginning in February of 1992, that it was not the standard of care for all hypertensive patients .to receive baseline renal function and periodic laboratory follow-up examinations?
A: Counselor, standard of care can mean many things. It can mean what’s good medicine but not necessarily a required standard of care. A standard of care to me relates to specific needs that have to be met, and I don’t think those things — that baseline lab work was thought of as being important in 1992 as it is in 1998.
Mrs. Costa was diagnosed with chronic renal failure. Dr. Boyd testified that chronic generally means that the condition existed for a period of at least two to three years. He thought Mrs. Costa was in chronic renal failure even when Dr. Leopard saw her in 1992. Dr. Roberts estimated that Mrs. Costa’s kidneys had been in failure for a number of years. Dr. Rising-er would not offer any opinion as to when Mrs. Costa’s kidneys first l^began to be *1279 come damaged from the hypertension, partly due to the lack of lab work. Dr. Risinger stated that (without lab reports) it was impossible to pinpoint when the renal failure began, although the ultrasound of the kidneys showed it had been going on for a prolonged period, probably for a number of years. Thus, it is possible that Dr. Leopard would have diagnosed her kidney condition if he had ordered lab tests when he treated her.
Nevertheless, it must be kept in mind that the failure to order lab tests was not what caused Mrs. Costa’s renal failure. Instead, she recovered damages for the pain and suffering she mostly endured in November of 1994 due to the failure to perform baseline and periodic lab studies. Dr. Leopard last examined Mrs. Costa nearly two years before she suffered her damages. His failure to order lab tests is simply too attenuated from Mrs. Costa’s damages (symptoms of renal failure) to find causation. Moreover, had Dr. Boyd ordered lab work at any point over the almost 18 months that he treated her, he would have noticed the elevated BUN and creatinine levels, referred her to a nephrol-ogist and likely spared her from what she experienced in November of 1994.
Appellants next point to incidents of noncompliance by Mrs. Costa as support for their contention that Mrs. Costa should bear some fault for her damages. There are two instances prior to November of 1994 when Mrs. Costa was allegedly not taking her blood pressure medication. Mrs. Costa reported to Dr. Leopard on March 17, 1992, that she had been out of Lopressor for three days. Mrs. Costa testified that she took her Lopressor 1 ^every day, as prescribed by Dr. Leopard. Dr. Boyd’s medical records reflect that Mrs. Costa reported on November 15,1993, that she was not taking her Lopressor. Dr. Boyd stated that he considered placing Mrs. Costa on Procardia on this date, but he did not do so because she had not been taking her Lopressor. Mrs. Costa testified that she took her medications as prescribed while being treated by Dr. Boyd, and she added that if she could not afford her medications, then her mother would purchase them.
These were the only two incidents of medication non-compliance over a period of more than two years. Moreover, the medical testimony was consistent that the declining renal function was inevitable and that controlling the blood pressure (through medication) would have only preserved what little, inconsequential function remained. In addition, it must be remembered that Dr. Boyd was not held liable for causing her renal failure.
Appellants also direct this court’s attention to the severing of the doctor-patient relationship by Mrs. Costa’s orthopedist, Dr. Michael Acurio, who treated her for a knee injury in 1992. Dr. Acurio recalled that Mrs. Costa stopped going to physical therapy, and did not come back for an examination for seven months during her treatment. Except as possibly evidence of a habit of non-compliance, Mrs. Costa’s history with Dr. Acurio has no significance in this matter.
Finally, appellants point to Mrs. Costa’s weight gain, which ultimately excluded her from a position on the kidney transplant list, and her failure at times to appear for dialysis. Mrs. Costa was considered an 1 ^excellent candidate for transplant in February 1996, except she was moderately overweight. In June of 1998, she was still considered an excellent candidate, but she needed to lose 50 pounds. In March of 1999, she was no longer considered a transplant candidate due to her obesity. We note that all of this occurred ■ after November of 1994.[4]
*1280 Based on our review of the record, we cannot conclude that the trial court was clearly wrong in assessing Dr. Boyd with 100% of the fault for the pain, suffering and mental anguish experienced by Mrs. Costa due to Dr. Boyd’s failure to order baseline blood tests.

DECREE

At appellants’ cost, the judgment is AMENDED to reduce the award of special damages, and as amended, the judgment is AFFIRMED.

. Dr. Boyd had earlier treated Mrs. Costa on November 5, 1991, on a referral from her orthopedic surgeon. She was complaining of cough and congestion at the time, and was not well enough to undergo a scheduled knee surgery. Dr. Boyd diagnosed an upper respi-ratoiy infection.

. "Stat” in. medical terminology is apparently short for the Latin word "statim,” which means immediately or at once.

. Progress Notes from November 22, 1994, state: "[Right] femoral dialysis catheter procedure deemed emergent.” A catheter was placed in her groin for hemodialysis at that time. A catheter for hemodialysis was placed in her neck six days later.

. The same is true for the report in the LSUMC records from 1996 that Mrs. Costa did not take her blood pressure medications because they made her ill when taken on an empty stomach.